HEBER B. EMERY & another *vs.* BOSTON TERMINAL COMPANY.

Suffolk.    January 15, 1901. — March 1, 1901.

Present: HOLMES, C. J., KNOWLTON, MORTON, BARKER, & LORING, JJ.

In a suit by a lessee for damages from the taking of the leased premises by right of eminent domain, the petitioner attempted to set up an oral extension of his lease. *Held*, that the respondent could take advantage of Pub. Sts. c. 120, § 3, without pleading it, it being incumbent on the petitioner to prove a good title, and if the petitioner's claim for damages depended wholly on the oral lease, the petition if it stated the facts would be demurrable.

It would seem, that under Pub. Sts. c. 120, § 3, an oral lease cannot be made good even between the parties by a subsequent memorandum written after the lessor has parted with his title, but, however that may be, such a memorandum can have no effect as against a stranger who acquired an independent title to the land before the memorandum was made.

*Semble,* that a tax title is a new title and not merely the sum of all old titles.   Per HOLMES, C. J.

The fact, that a lessor had been in the habit of renewing a tenant's lease whenever it expired and that both landlord and tenant intended to continue their relations on the same terms indefinitely, gives the tenant no property in the nature of an English customary tenant right.   Even if such intention added to the saleable value of his lease, the addition would represent a speculation on a chance and not a legal right, and expert testimony as to an increase in value from that source is incompetent.   *Baltimore* v. *Rice,* 73 Md. 307, cannot be followed under our statutes.

St. 1896, c. 516, providing for taking land for a south terminal station in Boston, by § 24 gave the owner of land taken thereunder three months after the filing of a location to vacate his premises.   *Held,* that the tenant of such an owner, whose lease expired twenty-five days after the three months allowed for removal, could not recover damages for interruption of his business by reason of having to move, or for the expenses of removing his property to a new place of business; and for loss of tenant fixtures he could recover at any rate no more than the damage caused by his having to leave on the earlier day instead of at the expiration of his lease.

PETITION by the lessees of Hobbs Wharf in Boston for the assessment of damages alleged to have been suffered from the taking of that wharf by the respondent under St. 1896, c. 516, filed May 5, 1897.

At the trial in the Superior Court, before *Blodgett,* J., it appeared, that the petition was brought by the lessees alone, William W. Manning and S. Welles Holmes, trustees, the lessors and owners of the wharf having made a settlement with the respondent.   The respondent expressly waived all objections to the non-joinder of the owners in the suit, and by the agreement and at the request of all parties the case was tried as if the only persons interested in the taking were the petitioners.   It was admitted that the fee of Hobbs Wharf was taken by the respondent on January 5, 1897, under St. 1896, c. 516, by a location filed on that day in the Suffolk Registry of Deeds.

From May 1, 1862, the present and former members of the firm of W. H. and S. L. Emery had been tenants and lessees of the premises taken by the respondent.   Their leases usually ran for two or three years, and from time to time as the leases terminated they were renewed or extended or a similar new lease was given, so that during the whole period of their occupancy they held the premises on substantially the same terms.   The testimony further tended to show that, irrespective of any covenant to renew, it was the intention of both the landlord and

tenants to continue their relations on the same terms indefinitely. On the expiration of the then existing lease on April 20, 1894, the owners of Hobbs Wharf gave the petitioners a new lease of the premises for one year from May 1, 1894, with the right to extend and renew the same for one additional year. The original lease and the indorsements thereon were put in evidence. On February 1, 1895, the lease of April 20, 1894, was renewed and extended for two years from May 1, 1895, by a writing indorsed on the lease. Before the last term expired there were some negotiations between the parties contemplating an extension or renewal of the lease, and some time during the week prior to Christmas, 1896, one of the petitioners called upon Holmes, mentioned above, the managing trustee of Hobbs Wharf, in regard to extending their lease from May 1, 1897. He was asked by the attorney for the petitioners to state the conversation that then took place in regard to the extending of this lease from May 1, 1897, the petitioners claiming that the evidence would show that in this conversation their lease of Hobbs Wharf was renewed and extended upon the then existing terms for one year from May 1, 1897, to May 1, 1898. Upon objection of the respondent the judge excluded the evidence, to which ruling the petitioners excepted.

The following indorsements were upon the lease:

"The Lessees to have privilege of renewing within lease, on same terms, for one year from May 1st, 1895, if notice is given Lessors, on or before 1st February, 1895. William W. Manning and S. W. Holmes, Trustees."

"Boston, February 1, 1895.

"Within lease renewed for two years from May 1st, 1895, on same terms. S. W. Holmes, for Self and Co-Trustee."

Holmes testified that subsequently, to wit, on January 8, 1897, he wrote a letter to the petitioner confirming the previous parol extension of the lease and identified the letter he had so written. The petitioners offered this letter in evidence, and upon objection of the respondent the judge excluded it, the letter having been written after the taking. To this ruling the petitioners excepted. The letter excluded was as follows:

"S. Welles Holmes, Room 5, 45 Broad Street, Boston. Boston, 8th Jan'y, 1897. Messrs. W. H. & S. L. Emery, Boston.

Dear Sirs, — Your favor of 2d inst. duly received.  According to the terms of the lease of Hobbs Wharf we have extended said lease for one year from May 1, 1897.   Yours very truly, S. Welles Holmes, for Self and Co-Trustee."

Holmes further testified that in the November before the taking he had some negotiations with a representative of the Terminal Company, in which he informed him that the Emery lease which would expire the following May was to be renewed for an additional year to May 1, 1898, and he made an agreement in writing with the Terminal Company to sell them Hobbs Wharf subject to the Emery lease thus extended.  This agreement was identified and offered in evidence, but upon the respondent's objection was excluded.  To this ruling the petitioners excepted.

The agreement excluded was dated November 25, 1896, and contained the following : " Said premises are to be conveyed on or before the twenty-sixth day of December, 1896, by a good and sufficient trustees' deed of the party of the first part, conveying a good and clear title to the same free from all incumbrances, except a certain lease expiring May 1, 1897, with privilege to the lessee of one additional year from that date ; all buildings and fixtures of which tenants have right of removal are excepted from this agreement, and for such deed and conveyance the party of the second part is to pay the sum of four hundred and thirty thousand dollars ($430,000).  If this property is taken by right of eminent domain before the sale is consummated, the price agreed shall be the damages paid."  An indorsement showed the time of performance of the agreement to have been extended to January 15, 1897.

Holmes also testified that he and his co-trustee had executed a deed of the property to the Terminal Company dated December 22, 1896, and acknowledged, delivered and recorded January 18, 1897, which deed was offered in evidence and admitted against the respondent's objection.

At various times, for the purpose of carrying on their trade as dealers in wood and coal, the petitioners had erected sheds and fitted up the premises with the fixtures and appliances necessary and proper to enable them to carry on their business, all of which sheds and fixtures they had the right to remove at any time that they themselves left the premises.

One Ellis, a carpenter and contractor, familiar with the Hobbs Wharf property, testified that it was not possible to remove these sheds as they then stood except by tearing them to pieces and rebuilding them, which was not practicable; that there were two hoisting machines consisting each of a large mast and boom with ropes, pulleys, etc., worth about $1,500 each, on January 5, 1897, and that they were affixed to the wharf, and that it would have cost $500 each to remove them.

William Emery, one of the petitioners, testified that on January 5, 1897, his firm had been served by the respondent with a notice to move, the notice itself being put in evidence, and that it had taken them about three months to remove in an economical and practical manner the coal which at that time was upon the wharf, and that they were not able to remove the sheds within the time allowed. He also gave figures showing the cost of removing the coal from Hobbs Wharf to a new wharf rented by them, and that they had finally removed from Hobbs Wharf on April 5, 1898, having paid no rent since January 5, 1897.

One Wead, a real estate dealer, called by the petitioners and duly qualified as an expert on real estate and rentals, was asked, " Assuming it to be a fact that it was the custom of the owners of Hobbs Wharf to renew the leases of the firm of W. H. & S. L. Emery from time to time as they expired, irrespective of any covenant to renew, in your opinion would the present leasehold of the petitioners have an enhanced value imparted to it by reason of the expectancy of the renewal of the present lease according to such custom?" This question, on the respondent's objection, the judge excluded, and the petitioners excepted.

Wead was further asked: " Assuming that when there is a custom for the landlord to renew the leases of the tenants from time to time as they come due, even in the absence of covenants of renewal it gives an ulterior interest beyond the subsisting term to the tenant called the 'Tenant Right.' Assuming that such a 'Tenant Right' existed in the present petitioners in relation to Hobbs Wharf, in your opinion would such a 'Tenant Right' enhance the value of the petitioners' property taken by the respondent?" This question, on the respondent's objection, the judge excluded, and the petitioners excepted.

He was further asked: " Assuming it to be a fact that the

petitioners are the tenants of the property described in the pro-
ceedings in this case, and that the lease of land had been re-
newed from time to time for a great number of years, and that
the tenants made valuable improvements upon the property,
relying upon a renewal of their leases, and that it was the inten-
tion of the landlord and the petitioners to renew said lease from
time to time, in your opinion would any additional marketable
value be imparted to the petitioners' interest by reason of the
probability of the renewal of said tenancy?" This question, on
the respondent's objection, the judge excluded, and the peti-
tioners excepted.

He was further asked: "What in your opinion is such
additional market value worth?" This question, on the re-
spondent's objection, the judge excluded, and the petitioners
excepted.

The petitioners requested the judge to instruct the jury as
follows: 1. As between the petitioners and the respondent the
extension of the lease to May 1, 1898, was valid and binding,
to grant a leasehold for that period without being in writing.
2. The defence of the statute of frauds to the extension of the
lease to May 1, 1898, is not open to the respondent. 3. The
letter of January 8, 1897, from Mr. Holmes, is a sufficient note
or memorandum of the extension of the lease from May 1, 1897,
to May 1, 1898, to satisfy the statute of frauds. 4. By the oral
agreement, and the letter of January 8, 1897, the petitioners
held a leasehold estate in the premises taken by the respondent
until May 1, 1898. 5. The petitioners had a valid enforceable
lease of the premises in question in this suit extending until
May 1, 1898. 6. When there is a custom for the landlord to
renew the leases of the tenants from time to time as they come
due, even in the absence of covenants of renewal it gives an
ulterior interest beyond the subsisting term to the tenant which
is called the "Tenant Right." If, therefore, the jury find that
it was the custom of the owners of Hobbs Wharf to renew the
leases of the firm of W. H. and S. L. Emery from time to time,
then in estimating the value of the present leasehold, irrespec-
tive of covenants of renewal, the jury may make a reasonable
allowance to the petitioners for their tenant right or expectancy
of renewal. 7. If the jury find from the evidence that the peti-

tioners are the tenants of the property described in the proceed-
ings in this case and that the lease of land had been renewed
from time to time for a great number of years, and that the
tenants made valuable improvements upon the property relying
upon a renewal of their leases, and that it was the intention of
the landlord and the petitioners to renew said lease from time
to time, then the jury in estimating the damages sustained by
the petitioners may take into consideration the additional mar-
ketable value, if any, imparted to the petitioners' interest by
reason of the probability of the renewal of said tenancy, pro-
vided the jury make proper allowance for the precarious nature
of such expectancy.  8. The petitioners are entitled to receive
as damages from the respondent a sum to compensate them for
injury to their business, the loss of the earnings and profits, for
the period that the business was temporarily suspended or inter-
rupted by removing from the Federal Street place to another
location.  9. The petitioners are entitled to recover in damages
the expenses of the removal of their property taken by the
respondent to the other place they secured for their business.
10. The petitioners are entitled to recover as damages for the
loss of the tenant fixtures which were taken from them, together
with damages for any depreciation in those tenant fixtures which
they were able to remove with them.

The judge refused to make the rulings requested, and in-
structed the jury among other instructions, as follows: "I in-
struct you in this case that in the assessment of damages you
will proceed upon the assumption that the petitioner's lease
would have ended, had there been no taking whatever, on the
1st day of May, 1897, and you cannot take into consideration
any oral agreement, or understanding or usage between the par-
ties as to extending or renewing the lease. . . .

"Certain sheds or buildings were erected upon this wharf,
and certain elevators.  Now, it is conceded by everybody that
those were treated from first to last as tenant's fixtures.  It is
not entirely certain that they ever became fixtures in any sense;
but, assuming for the purpose of the trial, and I do so instruct
you, that they were tenant's fixtures, the petitioners had the
right to remove those fixtures at any time before the termination
of their lease.  They had the right to remove them at any time

before the 1st day of May, 1897, if they cared to remove them. If they did not choose to remove them during that time, and had not the consent of the owners to remove them afterwards, they would become the property of the owners of the real estate, and would be treated as real estate. Now, I instruct you that these petitioners had the right to remove those fixtures at any time within three months after the taking. You will observe that the time within which they could remove the fixtures was abridged by twenty-five days; and the petitioners are entitled to recover, in addition to the damage to which I have already called your attention, whatever damage you say upon all the evidence in the case was sustained by reason of the fact that the time within which they might remove the fixtures was lessened by twenty-five days from what it would have been had they held possession until the termination of the lease by its own limitation. . . .

" I said to you, gentlemen, that the petitioners were required to remove those fixtures within three months. If they did not remove them within three months after the taking, they lost all right to remove them ; and you are not to give them damages for such as they did not remove, but you may consider what damages the petitioners sustained because they were unable to remove their fixtures, inasmuch as the time within which they would have had the right to remove them was cut down by twenty-five days."

The jury returned a verdict for the petitioners in the sum of $248.85 ; and the petitioners alleged exceptions, which, *Blodgett,* J., having resigned, were allowed by *Mason,* C. J., under St. 1894, c. 412.

*L. M. Friedman,* for the petitioners, upon his contention that the letter of January 8, 1897, was a sufficient " instrument in writing " to make valid the extension of the lease to May 1, 1898, argued as follows :

Pub. Sts. c. 120, § 3, although it now forms part of a chapter entitled " Of the Alienation of Real Estate," is in fact a provision of the statute of frauds. This section does not make it obligatory that a lease shall only be created by the terms of a written instrument, but merely that the terms of a parol lease shall be evidenced by a writing to be effective. Section 3 of

c. 120 first took its present form in the hands of the commissioners on the statutes in their report of 1834.   Report of the Commissioners, c. 59, § 28.

The commissioners took the substance of this provision from " An Act directing the mode of transferring real estates by deed, and for preventing fraud therein."   St. 1783, c. 37, § 1.

The first section of the St. of 1783 unites in a single paragraph, almost in its identical language, the provisions of both §§ 1 and 3 of the original statute of frauds.   29 Car. II. c. 3, §§ 1 and 3.

Section 1 of the St. of 1783 and the first part of the present § 3 relate to the creation of leasehold estates, and alone are involved in the present discussion.   Section 3 of the St. of 1783 and the latter part of the present § 3, deal only with the transfer of such interests where they already legally exist under § 1.   Browne, St. of Frauds, § 41.   Sugd. Vend. & Pur. c. 4, § 1.

So far as their notes show the commissioners intended to make no change in the old act but merely to condense its elaborate wording.   When, therefore, the present statutes speak of an " interest in land created without an instrument in writing," it means only what the older statute meant by " leases . . . made or created by livery and seisin only, or by parol, and not put in writing," and no more.

We are, therefore, not only justified in considering this § 3 of c. 120 as being part of the statute of frauds, but also in interpreting it in the spirit of that statute, and applying to it the same construction and rules that have been applied to its other sections.

The statute of frauds does not prohibit verbal contracts. On the contrary, it presupposes that the terms of the contract rest in parol proof, and only requires, in addition to the proof of such verbal agreement evidence of an additional fact in order to render the contract enforceable, *e. g.*, the fact that the lease was put in writing.   *Marsh* v. *Hyde*, 3 Gray, 331, 333.   *Mayberry* v. *Johnson*, 3 Green, 116.   *Sanders* v. *Partridge*, 108 Mass. 556.

For many purposes a lease not put in writing is effective. At most it is not void but merely voidable.   *Elliott* v. *Stone*, 1 Gray, 571, 574.

Section 3 does not require that a lease should be by deed. It simply means that in whatever way leases might have been created prior to the statute they may still be created, except that a writing must be given to show that they have been so created in order to give them greater effect than an estate at will.   It is not necessary that the writing so required should be made contemporaneously with the agreement.   It is sufficient if made at any time thereafter.   Browne, St. of Frauds, § 352 *a*. *Shippey* v. *Derrison*, 5 Esp. 190.   *Sievewright* v. *Archibald*, 17 Q. B. 103, 107.   *Williams* v. *Bacon*, 2 Gray, 387.   *Marsh* v. *Hyde*, 3 Gray, 331.   *Bird* v. *Munroe*, 66 Maine, 337.

Nor does the fact that the rights of third persons may be affected by the giving of the writing take away from the person who is required by the statute of frauds to sign such writing the right to give it at any time he may choose.   *Gardner* v. *Rowe*, 2 Sim. & Stu. 346, affirmed in 5 Russ. 258.   *Dixon* v. *Ewart*, Buck, 94.   *Dawson* v. *Ellis*, 1 Jac. & W. 524.   *Ambrose* v. *Ambrose*, 1 P. Wms. 321.   *Bedinger* v. *Whittamore*, 2 J. J. Marsh. 552.   *McCormac* v. *Smith*, 3 T. B. Mon. 429, 432.   *Carney* v. *Reed*, 11 Ind. 417.   *Bird* v. *Munroe*, 66 Maine, 337, 341.

When, therefore, we read § 3 of c. 120, as providing that a lease not put in writing, as contrasted with a lease afterwards put in writing, shall have the effect of a lease at will only, the sole question that remains is whether the letter of January 8, 1897, was a sufficient putting in writing of the previously made renewal.   It was not made contemporaneously with the lease, but we see that is not necessary.

Nor is it material that the location had been filed and the estate taken before the writing was made.   When the Terminal Company took the fee of Hobbs Wharf it took from each owner whatever estate he had.   On that day, W. H. and S. L. Emery had a leasehold of the property from May 1, 1897, to May 1, 1898, good and enforceable at law whenever they had the evidence of it in writing.   The lessors had the right to give the lessee the written evidence of their lease at any time.

Just as in *Gardner* v. *Rowe*, a bankrupt could give the writing, after his adjudication, the trustee of Hobbs Wharf could give the writing after the filing of the location.   Furthermore, the giving of such writing was no injury to the Terminal Com-

pany and it lost no rights thereby, because under the provision of Pub. Sts. c. 49, § 18, it was only obliged to pay the entire value of the land as a whole, irrespective of the existence of a lease or other contract between owners of different interests. *Burt* v. *Merchants' Ins. Co.* 115 Mass. 1, 15. The fact that it made a settlement with the landlords does not increase the rights of the respondent nor cut down the rights of the petitioners.

*P. H. Cooney*, for the respondent.

HOLMES, C. J. This is a petition for the assessment of damages caused by the taking of Hobbs Wharf in Boston under the right of eminent domain. The taking was on January 5, 1897. At that time the petitioners were in under a written lease which had been extended to May 1, 1897. The other parties interested have been settled with and there is no question about them. The petitioners offered to show an oral agreement extending their lease for a year more, made before January 5, and a written memorandum of the same made after that date. These were excluded by the court, and the petitioners excepted. The petitioners also excepted to the exclusion of an agreement under seal, made before the taking, between the owners of the wharf and the respondent, by which the owners covenanted to convey the premises on or before a certain date, free of incumbrances except a lease "expiring May 1, 1897, with privilege to the lessee of one additional year from that date," and by which the parties agreed that if the property was taken by right of eminent domain before the conveyance the price fixed should be the damages paid. Other exceptions will be mentioned later.

We think it quite plain, notwithstanding the acute argument for the petitioners, that the exclusion of the foregoing evidence was right. Pub. Sts. c. 120, § 3.

To begin with the question of pleading, it was not necessary for the respondent to plead the statute. It was a stranger to the petitioners' title, and, when the petitioners alleged that they had a good one, had a right to call on them to prove it without undertaking to specify in what respect it might turn out bad. A remote and imperfect analogy may be found in the rule that a stranger need not make profert of a deed. Shep. Touchst. 73. Moreover the petition itself sets out the facts, and would have

been demurrable but for the admitted interest of the petitioners up to May 1, 1897. *Ahrend* v. *Odiorne*, 118 Mass. 261, 268.

In the next place, the operation of the statute is not confined to privies, but the respondent can rely upon it. The natural interpretation of the words of Pub. Sts. c. 120, § 3, is that the writing required for the creation of an interest in land is more than a memorandum of the constituent act, that it is itself the constituent act. It seems to us clear that the writing must have a part at least in the creation of the estate. But if a different construction should be adopted in view of the history of the section and upon a comparison with Pub. Sts. c. 78, § 1, the result would not be changed.

At the date of the taking the petitioners had no more estate beyond May 1, as against the respondent, than they had as against the owners of the wharf. To that extent at least the words of the act are explicit. The statute here is not dealing with promises, in which case it naturally would be directed only to the rights of the parties to a contract, but with estates, which are interests *in rem*, good against all the world. It therefore is dealing with the rights of all the world, and when it says that an estate created without writing shall have the effect of an estate at will only, it affects the reciprocal rights of the tenant and of any one else who may be concerned in the nature of that estate.

The petitioners, having had no estate beyond May 1 at the date of the taking, could not get one by the retroaction of a letter from the former owners, who were strangers to the land at the time when it was written. It seems to be settled in England with regard to sales of chattels under the seventeenth section of the statute of frauds, (Pub. Sts. c. 78, § 5,) that the memorandum does not retroact so as to affect third persons. *Morgan* v. *Sykes*, stated in *Coats* v. *Chaplin*, 3 Q. B. 483, 486. *Stockdale* v. *Dunlop*, 6 M. & W. 224, 233. *Felthouse* v. *Bindley*, 11 C. B. (N. S). 869, 877. Benjamin, Sales, (7th Am. ed.) § 40 *a*, note *m*. See *Marsh* v. *Hyde*, 3 Gray, 331, 333; *Bird* v. *Munroe*, 66 Maine, 337, 343. In *Leadlay* v. *McRoberts*, 13 Ont. App. 378, 383, where it is said that an act satisfying the statute relates back to the date of the oral contract, the judge is speaking of the effect as between the parties, — a matter which we need

not consider.  A similar principle to that which we adopt is familiar in regard to ratification.  *Whiting* v. *Massachusetts Ins. Co.* 129 Mass. 240, 241.

The case of *Gardner* v. *Rowe,* 2 Sim. & Stu. 346 ; 5 Russ. 258, relied on by the petitioners, is not inconsistent with our decision.  That was the case of a trust declared by a bankrupt after the bankruptcy.  Assignees in bankruptcy are successors *per universitatem,* and stand in the shoes of the bankrupt.  *Chipman* v. *Manufacturers' National Bank,* 156 Mass. 147, 149.  *Phosphate Sewage Co.* v. *Molleson,* 5 Ct. of Sess. Cas. (4th Ser.) 1125, 1138. Property held in trust does not pass to them.  5 Russ. 262.  *Low* v. *Welch,* 139 Mass. 33.  And as was observed in argument, 2 Sim. & Stu. 348, the statute of frauds did not require trusts to be created by writing but only to be proved by it.  So, when the only change since the beginning of the alleged trust is the death of the *cestui que trust,* it may be that the trustee still can make a declaration which will be effectual as to the interests of the heirs and widow.  *Ambrose* v. *Ambrose,* 1 P. Wms. 321.  But the cases of *Gardner* v. *Rowe* and *Ambrose* v. *Ambrose* are inapplicable to the case of an instrument which is more than a memorandum.  They also are inapplicable to a case where the person to be affected comes in not in privity but by a new, adverse and paramount title.  Even a disseisor takes free of trusts, at least by the old law.  *Chudleigh's case,* 1 Co. 120, 122 *a.* Lewin, Trusts, (10th ed.) 9, 10, 13.  The prevailing opinion seems to be that a tax title is a new title and not merely the sum of all old titles.  *Hefner* v. *Northwestern Ins. Co.* 123 U. S. 747, 751.  *Brewer* v. *District of Columbia,* 5 Mackay, 274, 278. *McQuity* v. *Doudna,* 101 Iowa, 144, 146.  *Textor* v. *Shipley,* 86 Md. 424, 438.  See *Harrison* v. *Dolan,* 172 Mass. 395, 398.  And if there is such a thing as a new title known to the law, one founded upon a taking by the right of eminent domain is as clear an example as can be found.  See Williams, Pers. Prop. (15th ed.) 46.

It very properly was not argued that the reference to the tenants' supposed rights in the agreement between the owners and the respondent satisfied Pub. Sts. c. 120, § 3.  We need not go into the reasons further than we have done at the beginning of our discussion.  *Shippey* v. *Derrison,* 5 Esp. 190, seems to have

been a suit on a contract to take a lease, and so only to have involved the fourth section of the statute of frauds. Pub. Sts. c. 78, § 1.

It appeared that the owners had been in the habit of renewing the petitioners' lease from time to time, and an attempt was made to give this fact the aspect of an English customary tenant right. The evidence merely showed that the landlords and the tenants were mutually satisfied and were likely to keep on together. It added nothing except by way of corroboration to the testimony that they both intended to keep on. Changeable intentions are not an interest in land, and although no doubt such intentions may have added practically to the value of the petitioners' holding, they could not be taken into account in determining what the respondent should pay. They added nothing to the tenants' legal rights, and legal rights are all that must be paid for. Even if such intentions added to the saleable value of the lease, the addition would represent a speculation on a chance, not a legal right. The court was right in excluding expert evidence as to an increase in value from that source. *The King* v. *Liverpool & Manchester Railway*, 6 Nev. & Man. 186, 191; *S. C.* 4 Ad. & El. 650. Under our statutes we are not prepared to follow *Baltimore* v. *Rice*, 73 Md. 307. For as under the statutes the land was to be valued as a whole and then the amount subdivided, (St. 1896, c. 516, § 23; Pub. Sts. c. 112, §§ 95, 100, 107; c. 49, §§ 18, 22, 25,) the view opposite to ours would allow the tenants to diminish the share of the landowners on the strength of the latter having entertained an intention which they were free to change if they chose. See *Phyfe* v. *Wardell*, 5 Paige Ch. 268, 279. This consideration loses none of its force in determining the principle to be adopted merely because the landlords happened to have made an improvident bargain with the respondent in the particular case, — a matter with which the petitioners had nothing to do.

An exception was taken to the refusal of a ruling that the petitioners were entitled to recover of the respondent a sum to compensate them for injury to their business, the loss of the earnings and profits, for the period that the business was temporarily suspended or interrupted by removing from their old place to another location. The judge was right. It appears from

what we have said that the petitioners had no rights in the land as against the respondent after May 1. At that date they would have had to leave the premises and could have recovered nothing for being forced to do so. *Emerson* v. *Somerville,* 166 Mass. 115, 118. For this, if for no other reason, they were entitled to recover nothing for interruption of their business by reason of having to move. The same principle applies to a claim for the expenses of removing the petitioners' property to their new place of business.

The last exception argued was to a refusal to rule that the petitioners were entitled to recover " for the loss of the tenant fixtures which were taken from them, together with damages for any depreciation in those . . . which they were able to remove." All that is necessary to add with regard to this is that by the statute the respondent had to allow the petitioners three months for removing after taking the land. St. 1896, c. 516, § 24. That took them to April 5. Any damage caused by having to leave on that date rather than on May 1 the judge allowed the jury to give. That was as favorable an instruction as the petitioners were entitled to ask.

*Exceptions overruled.*