UNITED STATES of America, Plaintiff,

v.

27,223.21 ACRES OF LAND, More or Less, SITUATE IN LAS ANIMAS COUNTY, COLORADO; State of Colorado, Et al., and Unknown Owners, Defendants.

UNITED STATES of America, Plaintiff,

v.

6,414.13 ACRES OF LAND, More or Less, SITUATE IN LAS ANIMAS COUNTY, COLORADO; Evan C. Stineman, Jr., Et al., and Unknown Owners, Defendants.

UNITED STATES of America, Plaintiff,

v.

19,837.46 ACRES OF LAND, More or Less, SITUATE IN LAS ANIMAS COUNTY, COLORADO; Joe E. Faris, Et al., and Unknown Owners, Defendants.

UNITED STATES of America, Plaintiff,

v.

29,097.65 ACRES OF LAND, More or Less, SITUATE IN LAS ANIMAS COUNTY, COLORADO; Big Canyon Grazing Association, Et al., and Unknown Owners, Defendants.

UNITED STATES of America, Plaintiff,

v.

50.00 ACRES OF LAND, More or Less, SITUATE IN LAS ANIMAS COUNTY, COLORADO; Big Canyon Grazing Association, Et al., and Unknown Owners, Defendants.

UNITED STATES of America, Plaintiff,

v.

6,414.13 ACRES OF LAND, More or Less, SITUATE IN LAS ANIMAS COUNTY, COLORADO; Sharp Ranch, Inc., Et al., and Unknown Owners, Defendants.

Civ. A. Nos. 83–A–849, 83–A–601, 82–A–2198, 83–A–600, 83–A–1075 and 83–A–1176.

United States District Court, D. Colorado.

May 15, 1984.

Thomas P. Carolan, Trial Atty, Dept. of Justice, Land and Natural Resources, Land Acquisition, Washington, D.C., Linda A. Surbaugh, Asst. U.S. Atty., Denver, Colo., for plaintiff.

Hinkle, Cox, Eaton, Coffield & Hensley, Roswell, N.M., James M. Guy, John W. Lann, Timothy G. Brown, Wichita, Kan., Jeffrey O. McAnallen, Aurora, Colo., Jon L. Holm, Holm & Christensen, Joseph M. Montano, Malcolm M. Murray, Gorsuch, Kirgis, Campbell, Walker & Grover, Spencer T. Denison, Nancy J. Gegenheimer, Holme, Roberts & Owen, C. Scott Crabtree, Cogswell & Wehrle, Patricia A. Blizzard, Janet L. Miller, Asst. Atty. Gen., Natural Resources Section, Richard Silverstein, Galchinsky & Silverstein, Gregory L. Williams, Marcia M. Hughes, Marlin D. Opperman, Denver, Colo., Leon P. Sterling, Berniger, Berg, Sterling, Roth & Diver, Colorado Springs, Colo., Tuck Young, P.C., Pueblo, Colo., Alex S. Keller, Keller, Dunievitz & Johnson, Denver, Colo., for defendants.

## MEMORANDUM OPINION AND ORDER

ARRAJ, District Judge.

This matter is before me on defendants' motion in limine. In November 1982, the United States condemned thousands of acres of land in Las Animas County, Colorado for the Fort Carson Pinon Canyon Maneuver Site. That spawned numerous lawsuits, including the instant "leasehold cases"; they all involve condemned land that was owned by the State of Colorado, but leased to private individuals. In their motion in limine, defendants ask this Court to resolve now all common questions regarding the allocation of condemnation awards between lessors and lessees. These questions include: 1) how the compensable term of the lease is to be measured?; 2) whether the lessees are entitled to compensation for the taking of improvements on their leased land?; and 3) whether the lessees are entitled to severance damages? The parties have submitted exhaustive briefs on these issues and oral argument was heard April 16, 1984. I am now prepared to rule on the motion.

### 1. Compensable Term of the Lease

■ Before a condemnation award can be divided between lessors and lessees, the respective interests of the parties must be determined. Those interests are often defined by the compensable term of the lease. At first glance, the compensable term would appear to be synonomous with the unexpired or remaining period of time under the agreement. For example, under a 10 year lease where 4 years had passed at the time of the taking, lessee would be entitled to compensation for the remaining 6 years. A closer look, however, reveals that this mechanical formula is deceptive and incomplete. Indeed, both parties argue that the language in the lease mandates the use of a different formula; but they disagree about what that formula should be. On one end of the spectrum, the State urges contraction of the remaining term to 30 or 90 days, based upon the sale and re-lease clauses in the contract. On the other end, lessees insist that the compensable term be expanded to include the possibility of renewal. These widely divergent interpretations underscore the need to look closely at the language of the leases when deriving a formula for these cases.

The condemned land in question was owned by the State of Colorado and leased by the State Board of Land Commissioners, as trustee of the State's public lands, to private individuals. *See* Colo. Const. art. IX, §§ 9 and 10. The terms of these arrangements were governed by two similar

agreements: a "pre-1976" lease and a "post-1976" lease. In general, these contracts gave the lessees the right to use certain State property for grazing and agricultural purposes for a period of 10 years. Neither lease, however, contained a specific "condemnation clause". But other lease provisions purportedly governed such an eventuality. They included several clauses which preserved the State's right to cancel the leases under certain conditions: (1) if the lessor elected to sell all or any part of the premises and gave the lessee 30 days notice; (2) if the lessor received an application to lease all or any portion of the premises and it elected to do so and gave 90 days notice; or (3) if it appeared that the lessee had failed to take good care of the premises and lessor gave 10 days notice. The leases also reserved to the State Board "all rights and privileges of every ... kind or nature not herein specifically granted."

In addition to these contractual provisions, the parties' interests were governed by several State statutes. Colorado law requires the State to secure the "maximum possible revenue" and "optimum long-term revenue" from any lease of its property. *Colo.Rev.Stat.* §§ 36–1–114, 36–1–118(1)(a). Consequently, the Board could adjust rentals under any lease in order to maximize revenue. *See Colo.Rev.Stat.* § 36–1–114. The Board also had the power to sell any of its leased land "as though said lease had not been executed." *See Colo.Rev.Stat.* § 36–1–118(4).

### A.

With this general outline of the leases as background, I turn now to the parties' respective positions regarding the compensable term of the lease. According to the State, the lease language circumscribes the lessees' unexpired interests in the property. Because the Board could sell the leased land at any time with only 30 days notice to the tenant, lessees' interests are thereby limited to 30 days. Alternatively, the State contends that lessees' interests extend no longer than 90 days, or the notice period required prior to releasing it. During oral argument, the State of Colorado took this argument one step further and suggested that this interpretation is not based exclusively upon the "power to sell." Rather, it is also grounded in the fact that an alleged "sale" did in fact take place, namely the condemnation; and since the leases expressly provide that upon the sale of the leasehold property the interest of the lessee terminates, defendants' interests are limited to 30 days—or a nominal figure.

Under this analytical approach, the dispositive question is whether the condemnation proceeding had the effect of a "sale" as the term is used in the lease agreement. Several courts have considered this question and have held that "condemnation sales and other sales pursuant to eminent domain are sales although involuntary." *Herskovitz v. Vespico*, 238 Pa.Super. 529, 362 A.2d 394, 397 (Pa.1976); *see also Jackson v. State*, 213 N.Y. 34, 106 N.E. 758 (1914); *American Creameries Co. v. Armour & Co.*, 149 Wash. 690, 271 P. 896 (1928); *United States v. Certain Parcels of Land in Loyalsock T.P., Lycoming County, Pa.*, 51 F.Supp. 811, 812 (M.D.Pa. 1943); *People By and Through Dept. of Public Works v. County of Santa Clara*, 275 Cal.App.2d 372, 79 Cal.Rptr. 787, 790 (1969). The fact that it is an enforced sale, where the government stands toward the owner as buyer toward seller, does not alter this conclusion.

[W]here the lessee has agreed to relinquish possession of the leasehold property in the event of a transfer of title, it makes no difference whether the transfer be effected through voluntary or involuntary sale. [T]he important factor is that the lessee has agreed to a termination of the lease, if the property be conveyed under *any* circumstances. *United States v. 150.29 Acres of Land*, 148 F.2d 33, 36 (7th Cir.1945).

Courts, however, do recognize one major exception to this rule. Where a lease contains both a "sale" clause and a "condemnation" clause, the parties can only mean a "voluntary sale" in the sale provision. *Id.* at 36. To interpret it otherwise would ren-

der meaningless the separate clause for condemnation. Moreover, such a construction most accurately reflects the probable intention of the parties.

The leases in the cases at bar, which had only sale clauses [1], provided that if the property were sold, then the lease terminated. A condemnation clause or an express limitation upon such a sale was conspicuously absent from the agreements. The lessees promised to relinquish possession in the event of its sale and the fact that the actual transfers were effected by involuntary sales had no impact on that promise. Hence, it would do no violence to the intentions of the parties to find that a condemnation proceeding amounted to a "sale" under the terms of the lease. *United States v. 150.26 Acres, supra.*

The sale clauses, however, did require the State to give 30 days notice to the lessees in the event a sale was ordered. Lessees represent that the Board of Land Commissioners sent a notice of cancellation due to condemnation, but did so after the Declaration of Taking was filed by the United States. (Opening Br., p. 29, n. 17). And since the "sale" dates from the filing of the Declaration, lessees conclude that there was defective notice.

I agree with the lessee's conclusion: there was defective notice in these cases. But this inadequate notice did not render the takings invalid. Although the notice provision is important and must be given some meaning, its effect vis-a-vis the entire "sale" clause must be consistent with its intended function. The notice provision appears to have been included for several reasons. First, it gave the lessees an opportunity to attend the sale and compete as a bidder for its purchase. Also, it gave them an opportunity to make moving arrangements. Once the actual sale took place, lessees still had 30 days before they had to relinquish possession of the property.

In the instant cases, the "sales" were not ones in which lessees could have participated. Thus, the pre-sale notice requirement served no meaningful function under the circumstances. But the State's failure to notify lessees until after the leasehold property was "sold", may have impacted their moving preparations. As a result, I find that under the terms of the leases, lessees' possessory interests ran 30 days post-notice of termination. The compensable term of the lease is therefore measured from the Date of Taking until 30 days after notice was sent. In other words, if proper notice was given—30 days in advance of the Declaration of Taking—then lessees have no compensable interests. Their interests terminated the same day the government took the property. In the event that notice was sent less than 30 days in advance of the Declaration of Taking, the compensable term runs from the date of taking until 30 days after notice was sent. Finally, if no notice was sent to lessees, then the lease was not terminated under the sale clause. The mere power to terminate a lease is not a viable basis for measuring the compensable term of a lease. The formula under such circumstances would be based upon the unexpired period of time remaining under the agreement.

### B.

To the extent the foregoing discussion is not dispositive of the compensable term question, it is necessary to consider the lessees' expansion theory. According to their reading of the leases and the law, the term must include the possibility of renewal as of the date of the taking. I do not find lessees' position persuasive. Careful study of the relevant caselaw and underly-

---

1. Reserving, however, to the State of Colorado:
 a. The right to order the sale of all or any portion of said premises during the term hereof, _____. The lessor shall, if the sale is ordered, give to the lessee thirty (30) days' notice by mail of the date, time and place of sale. In the event said premises, or any part thereof, are sold this lease shall thereby be cancelled as to that portion or all of such lands sold, from which date the lessee shall have thirty (30) days to vacate the premises sold....

ing principles leads me to conclude that the possibility of renewal may not be considered in the valuation of the leasehold interest.

In *United States v. Petty Motor Co.*, 327 U.S. 372, 66 S.Ct. 596, 90 L.Ed. 729 (1946), the Supreme Court refused to recognize anything short of a right of renewal when measuring the value of the remainder of the term. *Id.* at 381, 66 S.Ct. at 601. It explained that "[t]he fact that some tenants had occupied their leaseholds by mutual consent for long periods of years does not add to their rights." *Id.* at 380, n. 9, 66 S.Ct. at 601, n. 9. The Court relied heavily upon the language and reasoning in *Emery v. Boston Terminal Co.*, 178 N.E. 172, 59 N.E. 763 (1901). In *Emery*, the court distinguished between customary renewal and a right to renew and emphasized that changeable intentions are not an interest in land and are therefore inappropriate factors to consider when determining what the government should pay. "Even if such intentions added to the salable value of the lease, the addition would represent a speculation on a chance, not a legal right." *Id.* at 765.

In accordance with this principle, the Tenth Circuit Court of Appeals held that a lessee is not entitled to recover the market value attributable to mere expectation of lease renewal. *Scully v. United States*, 409 F.2d 1061 (10th Cir.1969). It stressed that custom and usage may not be used to change or alter the clear and unambiguous language of a lease. The *Scully* court also warned that reading a right of renewal into a lease would be tantamount to the intolerable act of judicial revision. *Id.* at 1065. Thus, *Petty Motor* and *Scully* made clear that a court may not convert the mere expectation of renewal into a legal and therefore compensable right. *See also Pittsburgh Outdoor Advertising Corp.*, 440 Pa. 321, 272 A.2d 163, 166 (1970); *Stroh v. Alaska State Housing Authority*, 459 P.2d 480, 482 (Alaska 1969).

This bright line, however, became muddled in 1973 when the United States Supreme Court permitted the computation of fair market value of leasehold improvements to include a willing buyer's expectation that the lease would be renewed. *Almota Farmers Elevator & Warehouse Co. v. United States*, 409 U.S. 470, 93 S.Ct. 791, 35 L.Ed.2d 1 (1973). The *Almota* Court conceded that a lessee's expectation of having its lease renewed upon expiration is not itself a compensable legal interest. Yet it allowed the same practical result to be reached in the case of leasehold improvements. Sensitive to the apparent inconsistency, the Court explained that

> [u]nlike *Petty Motor*, there is no question here of creating legally cognizable value where none existed, or of compensating a mere incorporeal expectation. The petitioner here has constructed the improvements and seeks only their fair market value. *Petty Motor* should not be read to allow the government to escape paying what a willing buyer would pay for the same property.

409 U.S. at 476–7, 93 S.Ct. at 795–6. Following *Almota*, a court must carefully distinguish between leasehold improvements and general leasehold interests when determining whether the possibility of lease renewal may be considered part of its value.

Despite this legal precedent, lessees contend that their expectations of renewal are compensable legal interests which must be included when calculating the value of their general leasehold interests. First, they urge that state leases—as opposed to private consumer leases—must be analyzed differently. Because State leases have a preferential right of renewal under Colorado law [2], they purportedly have "[f]or all practical purposes ... an absolute right as against other applicants." Lessees conclude that such a legitimate probability of renewal should give rise to at least an opportunity to prove the compensable value

---

**2.** *Colo.Rev.Stat.* § 36–1–118(1)(c) provides that: Before land is leased to anyone other than the present lessee, said present lessee shall be given ten days' notice and an opportunity to negotiate with the state board of land commissioners concerning a new lease.

of the probability of lease renewal. Finally, lessees rely upon a footnote in *Alamo, Land & Cattle Co., Inc. v. Arizona,* 424 U.S. 295, 96 S.Ct. 910, 47 L.Ed.2d 1 (1976), for support of their position. In that case the Court left for determination on remand the question of how the leasehold interest was to be valued. In a cryptic footnote it remarked that "although we do not foreclose the relevance of possible renewals, the calculation of the lessee's interest cannot include the prospect of renewing the lease at less than fair rental value." 424 U.S. at 311, n. 12, 96 S.Ct. at 920, n. 12.

I am not persuaded that lessee's expectations of renewal are compensable interests in these condemnation cases. The statutory renewal preference may elevate their interests to a level of probability, but in any event it falls short of a compensable "legal right". Colorado law does not give these lessees a cognizable right or formal option to renew their leases. Nor does the *Alamo* footnote reflect a change in the U.S. Supreme Court's position on this issue. Consequently, I hold that the lessees are not entitled to recover the market value added by the possibility of lease renewal in the context of the general leasehold interests.

### C.

■ The last "compensable term" issue concerns the rental rate. To the extent that a lessee has a compensable interest in the unexpired term of a lease (see section "A"), there is a question regarding how that interest is to be valued. The confusion flows from the fact that the leases gave the Board the power to revise the rental rate. Specifically, the pre-1976 lease provided that "rental will be subject to review and revision after the first 5 year term of the lease." The post-1976 leases included this same mandatory language and added a provision for permissive annual review. Based upon these clauses, the State Board maintains that the lessees do not have a right to the initial rental rate for the entire period of the lease. The State also contends that when the terms of a lease allow the rate to be revised during the period of the lease, the leasehold interest is less valuable.

The general formula for calculating just compensation when a leasehold interest is taken is set forth in *United States v. Petty, supra:*

> The measure of damages is the value of the use of occupancy of the leasehold for the remainder of the tenant's term, plus the value of the right to renew in the lease of Petty, less the *agreed rent* which the tenant would pay for such use and occupancy. (Emphasis Added)
>
> 327 U.S. at 381, 66 S.Ct. at 601.

The fact that "agreed [upon] rent" is contractually subject to modification does not alter the standard formula. Even under those circumstances, the only ascertainable rent figure is the original rental rate. Theoretical rental revisions are too speculative to be useful. Moreover, leasehold interests should not be valued according to hypothetical possibilities which have no verifiable market basis. Nor should the Board's *power* to revise rental rates be included in the formula. The practical problems alone in valuing such an abstract right are insurmountable. For all of these reasons I hold that the rental revision provisions in the leases are not to be considered when valuing the instant leasehold interests.

### 2. Improvements

■ Where a lessee has more than a nominal interest in one of these leasehold estates, it is necessary to determine whether it is entitled to compensation for allegedly "unauthorized" improvements on the leased land. In the cases at bar, lessees purportedly failed to comply with the detailed improvement permission procedures set forth in the leases. The State Board argues that unless new or old improvements [3] were listed on the permit application form and approved, they were unauthorized; and since reimbursement for unauthorized improvements is left to the

---

**3.** The State Board concedes that cattle fences are compensable.

discretion of the lessor under the express terms of the lease, the State refuses to compensate lessees.

Lessees insist that they are entitled to full compensation for improvements upon their condemned leased lands. Since they paid for these improvements, either directly or as a condition precedent to the acquisition of their lease [4], they maintain that they have a compensable property interest in the fixtures. Lessees also argue that the formal approval procedures should not bar their recovery because of the special facts in these cases. According to lessees, the State Board was not only aware of the "unauthorized improvements", but failed to challenge their existence. In essence, the State allegedly ratified the improvements and thereby waived any right to deny later their compensability. Based upon equitable theories of unjust enrichment, estoppel or laches, lessees maintain that they are entitled to compensation for their improvements.

The improvement clause in question provided in relevant part as follows:

6—That no improvements shall be placed by the lessee upon or made upon the land herein leased for which payment can be required to be made by any purchaser or other lessee of the land, except in the manner and as hereinafter provided, to-wit:

a. Improvements other than cattle fences shall be permitted only upon the filing with the lessor of an Improvement Permit Application to be furnished by the lessor, in which application shall be set forth all improvements of any kind or character which may be upon the land, or which the lessee may desire to put upon the land and have attached as improvements to the land ....

b. That any of such improvements allowed by the lessor under said Improvement Permit Application to be placed upon the premises, shall become

permanently attached thereto, and shall become a part of the realty.

c. Any proposed improvement to the premises must receive written approval in advance by the lessor.... It shall be at the discretion of the lessor whether lessee shall be reimbursed for any unauthorized improvement....

(Post-1976 lease)

I find that the language in this provision is clear and unambiguous with respect to new or proposed improvements. A permit application had to be filed and approved in order for a lessee to be entitled to reimbursement. Accordingly, I hold that where lessees in the instant cases complied with this procedure, they are entitled to compensation for these condemned "new improvements".

Where there were improvements already on the leased lands, however, it is unclear. The sole reference to such "old or pre-existing improvements" is in Section 6(a) where it states that the permit application must include a list of all improvements "which may be upon the land". Standing alone, its meaning is unambiguous. But when viewed in the context of the entire section, the phrase is confusing. It is not clear whether a separate application was required for "old improvements" each time the lease was transferred to a new lessee. The language could be interpreted to mean that old improvements had to be listed on an application form for any new improvements; and in the absence of any new improvement proposals, no individual application for those improvements already in place was required. In short, once a transferee met its statutory duty to compensate the prior lessee for such improvements, all prerequisites were satisfied. On the other hand, the lease could be read to require that old improvements had to be approved each and every time there was a transfer. Yet such an interpretation seems untenable given the fact that the State required approval in order to stop the construction of

---

4. *See Colo.Rev.Stat.* § 36–1–119 (A condition precedent to the granting of a lease requires the new lessee to tender payment to the prior lessee for any improvements in place at the beginning of the leasehold term.)

improvements which decrease the land's value. (State's Br., p. 17).

█ Under general principles of contract construction, when there is an ambiguity in an instrument it is to be construed strictly against the drafter. *See Christmas v. Cooley,* 158 Colo. 297, 406 P.2d 333 (1965). Because the State of Colorado wrote these standardized lease agreements, I hold that the lessees are entitled to compensation for "old improvements" on their condemned leased lands. Further support for this conclusion can be found in the equitable doctrine of unjust enrichment. That doctrine applies when a benefit was conferred upon a party by the claimant, the party accepted the benefit, and circumstances make it inequitable for the party to retain the benefit. *Cargill, Inc. v. Stafford,* 553 F.2d 1222, 1224 (10th Cir.1977). Here, the Board was apparently aware of the existing improvements because it had to approve their initial construction. Moreover, the State does not deny that it knew of such improvements and yet never challenged or questioned the lessees' failure to obtain approval. I find that the Board implicitly accepted these known benefits through its inaction and waived any right to challenge now their compensability. To allow the State to deprive lessees of the value of these old improvements and thereby confer a direct and free benefit upon the State is contrary to all notions of fairness. A poorly drafted lease agreement should not be allowed to work such an injustice. I hold that the lessees are entitled to compensation for *any* old improvements and approved new improvements, based upon the increase in market value of the property attributable to such fixtures. Under *Almota, supra,* the test is what a willing buyer would have paid for the improvements.

### 3. Severance damages

Finally, these leasehold cases raise a question of first impression regarding sev-erance damages: whether lessees are entitled to severance damages where the government's partial taking of leasehold interests reduces the value of the owner's remaining property, including fee and leased lands?

Lessee-owners claim substantial damages from the severance of their leasehold interests from other lands because all of their property was used as a single economic unit for ranching purposes. They cite *United States v. 57.09 Acres of Land,* 706 F.2d 280 (9th Cir.1983) for the proposition that severance damages may not be conditioned upon the ownership of a fee interest. In that case, the owners of condemned easements claimed entitlement to severance damages for the reduction in value of their properties which were served by the easements. The United States intimated that severance damages were not appropriate because the parties held only a leasehold interest in the tract which the condemned easement served. Rejecting the government's unsupported position, the court held that "[w]here, as here, the leasehold is not condemned, but its value is diminished by the taking of an easement providing access to the leased property, severance damages should similarly be available to provide fair compensation." *Id.* at 282.

█ Although *57.09 Acres of Land* is factually distinguishable from the present cases, it is relevant and helpful. The decision draws into focus the principles underlying severance damages. It is well-established that severance damages, or damages to the remaining property caused by the taking, are recoverable where there is a partial taking of fee lands.[5] They are measured "by the difference between fair and reasonable market value of the entire ownership immediately before the taking and the fair and reasonable market value of the portion not taken immediately after the taking." *United States v. 91.09 Acres of Land,* 586 F.2d 79, 86 (8th Cir.1978),

**5.** *United States v. Miller,* 317 U.S. 369, 63 S.Ct. 276, 87 L.Ed. 336 (1943); *Stipe v. United States,* 337 F.2d 818 (10th Cir.1964).

*cert. denied,* 441 U.S. 944, 99 S.Ct. 2162, 60 L.Ed.2d 1045. Severance damages however, are not to be treated as a separate and distinct item because they are an integral part of the "before and after" measure of just compensation. *Id.*

 I hold that severance damages should also be recoverable where there is a partial taking of leasehold property. Under the fifth amendment, the government must pay the full monetary equivalent of the property taken. In other words, "[t]he owner is to be put in the same position monetarily as he would have occupied if his property had not been taken." *Georgia-Pacific Corp. v. United States,* 640 F.2d 328, 335 (Ct.Cl.1980), *quoting Almota supra* 409 U.S. at 473–474, 93 S.Ct. at 794. Here, the partial taking of leasehold interests purportedly reduces the value of remaining lands in the ranching operation. Under *57.09 Acres of Land,* the fact that these residual lands include leasehold interests—and not just fee lands—does not alter the principle that lessees are entitled to be made whole. Accordingly, I find that where the United States takes grazing leasehold interests which were part of a single economic ranching operation and thereby diminishes the value of the remaining fee title and leasehold lands in the same economic unit, severance damages may be awarded.

Accordingly, it is

ORDERED that the compensable term of an unexpired lease is to be measured from the date of taking until 30 days past the date of notice of cancellation due to condemnation; and if there was no notice of cancellation, then it is to be the unexpired period of time under the terms of the agreement.

ORDERED that the value of the general leasehold interest may not include lessees' expectancy of lease renewal, and may not take into account the mandatory and permissive rental review provisions in the contract.

ORDERED that lessees are entitled to be compensated for any old improvements on their leased lands.

ORDERED that lessees are entitled to be compensated for new improvements which the State Board approved.

ORDERED that lessees are entitled to prove severance damages, if any, in these leasehold cases.