No. 18,930.

The Cottrell Clothing Company v. Bernard E.
Teets, et al.

(342 P. [2d] 1016)

Decided July 6, 1959.   Rehearing denied August 31, 1959.

Mr. Joseph F. Little, for plaintiff in error.

Mr. DUKE W. DUNBAR, Attorney General, Mr. FRANK E. HICKEY, Deputy, Mr. JAMES D. McKEVITT, assistant, for defendants in error.

*En Banc.*

MR. JUSTICE MOORE delivered the opinion of the Court.

THIS cause is before us on writ of error to review the judgment of the district court of the City and County of Denver entered in proceedings which originated before the Executive Director of Employment Security on a claim for unemployment compensation.

The applicant was granted compensation without disqualification before the administrative agency. Upon review in the district court the award of the commission was modified to the extent that the maximum disqualification for benefits, amounting to ten weeks, was imposed upon claimant. The effect of the district court judgment was to make available to claimant a maximum of sixteen weeks compensation, instead of twenty-six weeks to which he would have been entitled except for his alleged misconduct. The employer, The Cottrell Clothing Company, seeks reversal contending that the act authorizing unemployment compensation to an employee who has been discharged for misconduct connected with his work, is unconstitutional.

There is no dispute in the pertinent facts which were before the trial court on stipulation. The applicant, Phillip Downare, was a clothes presser employed by Cottrell. The employer had purchased and installed clothes pressing machinery which Downare refused to use after being directed several times to do so. On the date when he was discharged the employer found five suits on the delivery rack containing alteration marks which the new equipment would have removed had it been used. The suits were not in fit condition to be delivered to customers. Thereupon Downare was dis-

charged. He applied for unemployment compensation and his application was opposed by Cottrell. The claimant, although served with process in the district court action, did not enter an appearance and is not represented in this court.

Pertinent provisions of the Colorado Employment Security Act to which our attention is directed by counsel, are the following:

C.R.S. 1953, 82-1-2, contains the legislative declaration of public policy wherein we find this statement:

"The legislature, therefore, declares that in its considered judgment the public good, and the general welfare of the citizens of this state require the enactment of this measure, under the police powers of the state, for the compulsory setting aside of unemployment reserves *to be used for the benefit of persons unemployed through no fault of their own.*" (Emphasis supplied.)

This section also uses the term "involuntary unemployment" and states that it is "a subject of general interest and concern which requires appropriate action by the legislature * * *."

Prior to 1957 the law provided that the maximum weekly benefit payments and the maximum period of weekly disqualifications were equal at twenty each. In 1957 the legislature amended C.R.S. '53, 82-4-4 to read in pertinent part as follows:

"Any otherwise eligible individual shall be entitled during any benefit year to a total amount of benefits equal to whichever is the lesser of twenty-six times his weekly benefit amount and one-third of his wage credits for insured work paid during his base period; * * *."

The 1957 amendment to 82-4-9 (1) reads in part as follows:

"(a) An individual shall be disqualified for benefits if the department finds that such individual has * * * left work voluntarily without good cause, or been discharged for misconduct connected with his work * *. *."

"(b) Such disqualification shall be not less than one

week nor more than ten consecutive weeks in addition to the waiting period, * * *."

C.R.S. '53, 82-7-1, creates the Unemployment Compensation Fund to which "contributions" must be made by employers who come within the provisions of the act. This section concludes with the following language: "All money in the fund shall be commingled and undivided."

C.R.S. '53, 82-6-3, requires that the administrative agency shall "maintain a separate account for each employer and shall credit his account with all contributions paid on his own behalf." After a fixed period of "contributions" to the fund on the part of an employer, the amount thereof thereafter depends upon his benefit experience, that is to say, if his turnover of employees is large and numerous claims for compensation are made by his one-time employees, his "contribution," or tax, is higher. If no claims are shown by his "benefit experience" or if they are few, he may conceivably be relieved of further contributions to the fund, so long as required reserves in his account are available.

The complaint filed by the employer in the district court questions the constitutionality of the act which authorizes payment of sixteen weeks unemployment compensation to one who is discharged for misconduct connected with his work. The specific contentions are that the act: (a) deprives the employer of its property without due process of law; (b) authorizes the administrative agency to expend moneys for purposes other than those for which they were intended; (c) grants irrevocable privileges to persons who quit their employment or are discharged for misconduct; (d) impairs the obligation of the contract alleged to exist between the employer and the State of Colorado; (e) permits the taking of private property by the State of Colorado for private use without consent of the owner; (f) allows an expenditure of moneys of the employer without affording it an opportunity to object thereto, or to pursue judicial rem-

edies to restrain such taking; (g) that the act improperly delegates judicial powers to an administrative agency; and (h) that the procedures prescribed by article 5, chapter 82, for filing of claims and the determination thereof, violate the Colorado constitution in that they establish burdensome, expensive and time-consuming procedures which, in effect, nullify and discourage appeals by persons adversely affected by the orders of the administrative agency.

Questions to be Determined.

First: *Is the matter of compensation for unemployment a subject so related to the public welfare as to authorize the general assembly, in the exercise of the police power, to enact a law directing the payment of benefits to unemployed persons and levying a tax upon employers to defray the cost thereof?*

This question is answered in the affirmative. The line of demarcation between a proper exercise of the police power and an infringement of constitutional guarantees is not always well defined. We deem it advisable to direct attention to some fundamentals in this connection, and to that end, we quote from the opinion in *In Re Interrogatories,* 97 Colo. 587, 52 P. (2d) 663, as follows:

"Police power, the genesis of the General Assembly's action, is inherent in government, and was well known to the common law. 4 Blackstone's Comm. 162. 'This power * * * has been said to be as broad as the public welfare. It is an inherent attribute of sovereignty with which the state is endowed for the protection and general welfare of its citizens, * * *.' *Rowekamp v. Mercantile-Commerce* B. & T. Co., 72 F. (2d) 852, 858. (Circuit Court of Appeals, Eighth Circuit). 'All authorities agree that the Constitution presupposes the existence of the police power, and is to be construed with reference to that fact.' *Village of Carthage v. Frederick,* 122 N.Y. 268, 273; 19 Am. S.R. 490, 10 L.R.A. 178. The statute claiming our attention is the expression of that branch of the

government having primary authority to determine what is requisite to promote and preserve health, safety and morals. *Smith v. People,* 51 Colo. 270, 117 Pac. 612; II Cooley's Constitutional Limitations (8th Ed.) p. 1231. Unless by its terms it imports evil, or is calculated to operate arbitrarily, oppressively or unreasonably, courts may not void the act. *McLean v. Arkansas,* 211 U.S. 539, 29 Sup. Ct. 206, 53 L. Ed. 315. That in its operation a police measure may increase their labor, decrease the value of their property, or otherwise inconvenience individuals, does not make the act to offend. II Cooley's Constitutional Limitations (8th Ed.) pp. 1228, 1231. By exercise of inherent police power, the sovereign, purposing to promote public health, may fairly and reasonably restrict the use of property. *Beveridge v. Harper & Turner Oil Tr. Co.,* **168 Okla. 609, 35 P. (2d) 435. The unre-**stricted privilege to engage in business or to conduct it as one pleases, is not guaranteed by the Constitution. *Nebbia v. New York,* 291 U.S. 502. 'A large discretion is necessarily vested in the legislature, to determine not only what the interests of the public require, but what measures are necessary for the protection of such interests.' II Cooley's Constitutional Limitations (8th Ed.) p. 1231. 'When the subject lies within the power of the state, debatable questions as to reasonableness are not for the courts but for the legislature, which is entitled to form its own judgment, and its action within its range of discretion cannot be set aside because compliance is burdensome.' *Sproles v. Binford,* **286 U.S. 374, 52 Sup. Ct. 581.**"

■ The consequences resulting from widespread unemployment have a very definite relation to the general welfare of the public. Through depressions of the past we have learned at first hand the nature and extent of the problems arising from unemployment, and everyone appreciates its profound influence upon the welfare of the people as a whole. As stated by the Supreme Court of the United States in *Carmichael v. Southern Coal Co.,*

301 U.S. 495, 57 S.C. 877, 109, A.L.R. 1327, the available research material upon the subject shows:

"\* \* \* that unemployment apparently has become a permanent incident of our industrial system; that it varies, in extent and intensity, with fluctuations in the volume of seasonal businesses and with the business cycle. It is dependent, with special and unpredictable manifestations, upon technological changes and advances in methods of manufacture, upon changing demands for manufactured products — dictated by changes in fashion or the creation of desirable substitutes, and upon the establishment of new sources of competition.

"The evils of the attendant social and economic wastage permeate the entire social structure. Apart from poverty, or a less extreme impairment of the savings which afford the chief protection to the working class against old age and the hazards of illness, a matter of inestimable consequence to society as a whole, and apart from the loss of purchasing power, the legislature could have concluded that unemployment brings in its wake increase in vagrancy and crimes against property, reduction in the number of marriages, deterioration of family life, decline in the birth rate, increase in illegitimate births, impairment of the health of the unemployed and their families and mulnutrition of their children.

\* \* \*

"The end being legitimate, the means is for the legislature to choose. When public evils ensue from individual misfortunes or needs, the legislature may strike at the evil at its source. If the purpose is legitimate because public, it will not be defeated because the execution of it involves payments to individuals. *Kelly v. Pittsburgh,* supra; *Knights v. Jackson,* 260 U.S. 12, 15; cf. *Mountain Timber Co. v. Washington,* 243 U.S. 219, 239-240. 'Individual interests are aided only as the common interest is safeguarded.' See *Cochran v. Board of Education,* 281 U.S. 370, 375; cf. *Clark v. Nash,* 198 U.S. 361, 367; *Hairston v. Danville & Western Ry. Co.,* 208

U.S. 598, 608; *Noble State Bank v. Haskell,* 219 U.S. 104, 110."

Second: *Does the act here in question violate the specific constitutional provisions to which our attention has been directed by counsel for the employer?*

█ This question is answered in the negative. The main issue raised by the employer and the one chiefly argued by its counsel is that C.R.S. '53, 82-4-9 (1), which limits the disqualification for benefits to a maximum of ten weeks and thereby enables persons "disqualified" from benefits to nevertheless receive them for a period of sixteen weeks, deprives the employer of its property without due process of law. For the purpose of this discussion we assume that the employer, whose future rate of contribution may be increased if his "benefit experience" shows increased claims, has a property interest in the fund. We make it clear that we do not so decide, and again state that the premise is assumed solely for the purpose of discussion. Even so, we hold that there is no denial of due process of law. We deem it sufficient to cite as authority for this conclusion the language of the Supreme Court of the United States in *Carmichael v. Southern Coal Co.,* supra, as follows:

"(b) Extension of Benefits. The present scheme of unemployment relief is not subject to any constitutional infirmity, as respondents argue, because it is not limited to the indigent or because it is extended to some less deserving than others, such as those discharged for misconduct. While we may assume that the state could have limited its award of unemployment benefits to the indigent and to those who had not been rightfully discharged from their employment, it was not bound to do so. Poverty is one, but not the only evil consequence of unemployment. Among the benefits sought by relief is the avoidance of destitution, and of the gathering cloud of evils which beset the worker, his family and the community after wages cease and before destitution begins. We are not unaware that industrial workers are not an

affluent class, and we cannot say that a scheme for the award of unemployment benefits, to be made only after a substantial 'waiting period' of unemployment, and then only to the extent of half wages and not more than $15 a week for at most 16 weeks a year, does not effect a public purpose, because it does not also set up an elaborate machinery for excluding those from its benefits who are not indigent. Moreover, the state could rightfully decide not to discourage thrift. *Mountain Timber Co. v. Washington,* supra, 240. And as the injurious effects of unemployment are not limited to the unemployed worker, there is scope for legislation to mitigate those effects, even though unemployment results from his discharge for cause."

In the case of *W. H. H. Chamberlin, Inc. v. Andrews, et al.,* 271 N. Y. 1, 2 N.E. (2d) 22, the court, in considering issues similar to those in the instant case, stated:

"Whether or not the Legislature should pass such a law, or whether it will afford the remedy or the relief predicted for it, is a matter for fair argument but not for argument in a court of law. Here we are dealing simply with the power of the Legislature to meet a growing danger and peril to a large number of our fellow citizens, and we can find nothing in the act itself which is so arbitrary or unreasonable as to show that it deprives any employer of his property without due process of law or denies to him the equal protection of the laws."

We have examined the references to other alleged violations of constitutional provisions and find nothing to justify a declaration that the act in question is unconstitutional.

The judgment of the trial court is affirmed.