ART NEON CO. et al., Plaintiffs,

v.

The CITY AND COUNTY OF DENVER,
a municipal corporation, and Anthony
H. Jansen, Defendants,

and

Gump Glass Co., Intervenor.

Civ. A. No. C–3427.

United States District Court,
D. Colorado.

April 4, 1973.

Hoffman, Goldstein & Armour, by Alan A. Armour, Denver, Colo., for plaintiffs and intervenor.

Max P. Zall, City Atty., Earl T. Thrasher, Asst. City Atty., Denver, for defendants.

Davis, Graham & Stubbs, by Richard P. Holme, Denver, Colo., and Gibson, Dunn & Crutcher by Theodore B. Olson, Los Angeles, Cal., for amicus curiae Combined Communications Corp.

Lawrence A. Wright, Jr., Richard F. Mauro, and Howard B. Gelt, Denver, Colo., for amici curiae Consumers.

## MEMORANDUM OPINION

WINNER, District Judge.

Following submission of comprehensive pretrial briefs, this case was tried to the Court. Thereafter, long post trial briefs were filed, and the case is ready for determination by this opinion which contains the findings and conclusions required by Rule 52.

Plaintiffs' complaint makes a hydra-headed attack on the validity and constitutionality of the sign code of the City and County of Denver. [Revised Municipal Code, Sec. 613, and, more particularly, Sec. 613.5 of the Code.] Some of

plaintiffs' claims raise questions we deem to arise only under the Constitution of the United States; some argue provisions of both state and federal constitutions, while others are directed at case law and the Constitution of the State of Colorado. By order of March 24, 1973, the Court limited the issues it would try to those arising only under the Constitution of the United States, and, although plaintiffs urged that there is pendent jurisdiction to try other claims, we ruled that under the principles of United Mine Workers v. Gibbs (1966) 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218, and Reetz v. Bozanich (1970) 397 U.S. 82, 90 S.Ct. 788, 25 L.Ed.2d 68, myriad problems should be left for state court determination. We accepted the following phraseology by the city of the question the Court should determine:

"Whether the requirement that certain existing signs owned by plaintiffs be terminated over the periods prescribed by the ordinance is a valid exercise of the municipal police power or an unconstitutional taking of private property without compensation having been made therefor; or is an unconstitutional impairment of the obligation of certain contracts relating to the leasing of signs owned by plaintiffs."

By supplementary order of July 18, 1972, it was explained that included within the issues which might be determined was "the question of equal protection as that question applies to the differing amortization periods [contained in the ordinance]."

Thus, the constitutional question we today decide is important, but the question decided is narrow, and many of plaintiff's challenges of the ordinance are not resolved.[1] Perhaps we should mention a few of the many things we do not decide.

(1) The city says that some of the signs exist under revocable permit to use city-owned property. We decide nothing having to do

---

1. These matters are left for state court determination.

with this contention of the city nor do we decide anything arising under plaintiffs' claim that the city is estopped to enforce revocability of any permits. This is a problem for the state courts.

(2) The city says that a sign of Michael T. Thomase, d/b/a Colonial Motel exists under a special dispensation and that it is not affected. We make no determination concerning this.

(3) The right of the city to prohibit the erection of any or all future advertising signs is not before us, and we make no decision as to the validity or invalidity of any such ordinance which may or may not be enacted in the future, although we recognize that there is much authority for upholding such prohibitions.

(4) We decide no questions concerning the reasonableness of the regulations as they relate to the type of business involved, the zone in which the sign is located, the comparable heights of signs in various zones, differentiations between free standing and attached signs and various other types of claimed inequality between signs.

(5) We make no decision as to the validity of the sign code under state law.

(6) We make no determination as to whether the code draws arbitrary distinction between various signs.

■ Moreover, we do not quarrel with nine of the ten "legal principles" argued by the city. We accept as truisms these "legal principles" stressed in the city's brief:—

1. Denver's charter permits the city to enact zoning ordinances.

2. In adopting zoning ordinances, Council may divide the city into districts.

3. Classification within various zone districts is permitted, and outdoor advertising is a type of business subject to separate classification and regulation.

4. Zoning ordinances are to be construed as a whole.

5. Ordinances are presumptively constitutional.

6. If constitutionality is debatable, the ordinance should be upheld.

7. If there is a reasonable factual basis on which the ordinance can be found valid, a court should assume that the legislative body acted on the basis of those facts [unless the record affirmatively shows that another factual basis was relied upon].

8. Many cases hold, and the Colorado Supreme Court has held that under Colorado law non-conforming uses may be terminated if a reasonable amortization period is allowed. [The underlying reasoning of these cases is that constitutionally just compensation may be provided by amortization.]

9. Non-conforming uses should be made conforming as rapidly as is reasonably possible.

■ We do not agree with the city's tenth "legal principle" that a plan of amortization is the only way in which just compensation can be paid for required termination of non-conforming uses. Lamm v. Volpe (1971) 10 Cir., 449 F.2d 1202, infra, 23 U.S.C. § 131 and 1963 C.R.S., 1971 Perm.Supp., 120–5–28(2), all dispose of this "legal principle." The Colorado statute provides:

"The division of highways may remove any nonconforming advertising device and may acquire all real and personal property rights pertaining to the nonconforming advertising device by gift, purchase, agreement, exchange, or eminent domain. All proceedings in eminent domain shall be conducted as may be provided by law. The division of highways may adopt appraisal concepts and acquisition procedures which are appropriate to the evaluation and removal of nonconforming advertising devices."

If the city wishes to adopt an ordinance similar to the Colorado statute or similar to the federal Highway Beautification Act, no Fifth Amendment question can arise under such an ordinance. The case is before us only because the city wants to force destruction of the signs without cash outlay on its part and because it insists on paying the compensation it admits is due only by way of an amortization scheme instead of paying compensation the way the state and federal governments do. As we shall see before this opinion is concluded, the only real question is, "Who is to pick up the tab for beautification of the city resulting from the tearing down of the advertising signs?" The state and the federal government think that the taxpayers must pay the piper. The city says that the sign companies have to bear the loss.

■ Before entering upon a discussion of this fundamental question, it is necessary that we dispose of a preliminary argument advanced by the city. The city says that three of the plaintiffs and an intervenor have failed to establish jurisdictional amount. In effect the city argues that proof by these parties at time of trial would not justify an eminent domain award in excess of $10,000.00, but this isn't the test of amount in controversy. St. Paul Mercury Indemnity Co. v. Red Cab Co. (1938) 303 U.S. 283, 58 S.Ct. 586, 82 L.Ed. 845. The evidence established that these parties made a good faith claim that they will be damaged by more than $10,000 in a given year as a result of the enforcement of the ordinance, and that is all that is required. The evidence abundantly meets the test of Ronzio v. Denver & R. G. W. R. Co. (1940) 10th Cir., 116 F.2d 604:

"In determining the matter in controversy, we may look to the object sought to be accomplished by the plaintiffs' complaint; the test for determining the amount in controversy is the pecuniary result to either party which the judgment would directly produce."

In support of its jurisdictional amount argument, the city almost concedes that the evidence at the time of the preliminary injunction hearing was sufficient to establish jurisdictional amount, but then counsel say, "We know of no rule of law whereby the evidence offered by these parties in an application for preliminary injunction carries forward to a hearing on the merits of the case." Rule 65(a)(2) enunciates such a rule:

" . . . any evidence received upon an application for a preliminary injunction which would be admissible upon the trial on the merits becomes a part of the record on the trial and need not be repeated upon the trial."

Jurisdictional amount was proven as to all parties, and with the question of jurisdictional amount out of the way, we come to the merits of the case. The important parts of the challenged ordinance are:

"*Sec. 613–5. Nonconforming Signs.*

".5–1. Declaration of Public Policy.

It is reasonable that a time limit be placed upon the continuance of existing nonconforming signs. An amortization program permits the owner to plan during a period when he is allowed to continue the nonconforming signs while at the same time assuring that the District in which the nonconforming signs exist will eventually benefit from a substantial uniformity of permanent signs.

".5–2. Definition of Nonconforming Signs.

A nonconforming sign shall be any sign which:

".5–2(1). On the effective date of this ordinance was lawfully maintained and had been lawfully erected in accordance with the provisions of any prior zoning ordinance but which sign does not conform to the limitations established by this ordinance in the District in which the sign is located; or

".5–2(2). On or after the effective date of this ordinance was lawfully

maintained and erected in accordance with the provisions of this ordinance but which sign, by reason of amendment to this ordinance after the effective date thereof, does not conform to the limitations established by the amendment to this ordinance in the District in which the sign is located.

".5–3. Continuance of Nonconforming Signs.

Subject to the termination hereinafter provided, any nonconforming sign may be continued in operation and maintained after the effective date of this ordinance; provided, however, that no such sign shall be changed in any manner that increases the non-compliance of such sign with the provisions of this ordinance established for signs in the District in which the sign is located; and, provided, further, that the burden of establishing a sign to be nonconforming under this Section rests entirely upon the person or persons, firm or corporation claiming a nonconforming status for a sign.

".5–4. Termination of Nonconforming Signs.

".5–4(1). By Abandonment. Abandonment of a nonconforming sign shall terminate immediately the right to maintain such sign.

".5–4(2). By violation of the Ordinance. Any violation of this ordinance shall terminate immediately the right to maintain a nonconforming sign.

".5–4(3). By Destruction, Damage or Obsolescence. The right to maintain any non-conforming sign shall terminate and shall cease to exist whenever the sign is damaged or destroyed, from any cause whatsoever, or becomes obsolete or substandard under any applicable ordinance of the municipality to the extent that the sign becomes a hazard or a danger.

".5–5(4). By Amortization. The right to maintain a nonconforming sign shall terminate in accordance with the following schedule:

"Any sign which on the date the sign became nonconforming would cost the following amount to replace: Shall be terminated within the following period after the sign became nonconforming:

| | |
|---|---|
| "$0 to $3,000 | 2 years |
| 3,001 to 6,000 | 3 years |
| 6,001 to 15,000 | 4 years |
| 15,001 or more | 5 years |

".5–5(4)(a). The right to maintain a flashing, blinking, fluctuating, animated or portable sign shall terminate within 30 days after such sign becomes nonconforming."

Whether this ordinance amounts to a permissible use of the police power or amounts to a taking requiring the payment of just compensation under the Fifth Amendment is not a question of easy determination. As was said in United States v. Central Eureka Mining Co. (1958) 357 U.S. 155, 78 S.Ct. 1097, 2 L.Ed.2d 1228.

"Traditionally, we have treated the issue as to whether a particular governmental restriction amounted to a constitutional taking as being a question properly turning upon the particular circumstances of each case. See, Pennsylvania Coal Co. v. Mahon, 260 U.S. 393 [43 S.Ct. 158, 67 L.Ed. 322]. In doing so, we have recognized that action in the form of regulation can so diminish the value of property as to constitute a taking. E. g., United States v. Kansas City Ins. Co., 339 U.S. 799 [70 S.Ct. 885, 94 L.Ed. 1277]; United States v. Causby, 328 U.S. 256 [66 S.Ct. 1062, 90 L.Ed. 1206]. However, the mere fact that the regulation deprives the property owner of the most profitable use of his property is not necessarily enough to establish the owner's right to compensation."

The difference between a permissible exercise of the police power and a taking requiring compensation was discussed by Judge Barrett in Lamm v. Volpe (1971) 10 Cir., 449 F.2d 1202. It was there

contended that the Tenth Amendment prohibited Congress from enacting the Highway Beautification Act [23 U.S.C. § 131]. The Court held that Lamm had no standing and that the question was moot because the State of Colorado had adopted legislation meeting the requirements of the Highway Beautification Act. However, in the course of the opinion it was said:

"Lamm has introduced several bills in the Colorado Legislature which he believes would provide effective control of outdoor advertising through exercise of the state police power in lieu of just compensation. Although he does not specifically identify to the police power relied upon, we assume here that his bills declared outdoor advertising adjacent to certain highways a public nuisance, subject to destruction or abatement as injurious to public safety. We recognize that police power is a matter of legislative prerogative. In this field the legislature has wide discretionary powers. It includes everything essential to public safety, health, and morals. Cottrell Clothing Company v. Teets, 139 Colo. 558, 342 P.2d 1016 (1959). Police power should not be confused with eminent domain, in that the former controls the use of property by the owner for the public good, authorizing its regulation and destruction without compensation, whereas the latter takes property for public use and compensation is given for property taken, damaged or destroyed. Chicago B. & Q. Railway v. State of Illinois ex rel. Drainage Comm'rs., 200 U.S. 561, 26 S.Ct. 341, 50 L.Ed. 596 (1906); Appeal of White, 287 Pa. 259, 134 A. 409 (1926); Annot., 53 A.L.R. 1215 (1928).

"Here the power of regulation has not been preempted by the Congress. But that begs the point. The Congress has clearly determined that the 'taking' of outdoor advertisements adjacent to federal-aid highways required 'just compensation'. The Tenth Amendment has been construed 'as not depriving the national government of authority to resort to all means for the exercise of a granted power which are appropriate and plainly adapted to the permitted end.' United States v. Darby, 312 U.S. 100, 124, 61 S.Ct. 451, 462, 85 L.Ed. 609 (1941). . . ."

Lamm v. Volpe does not pass on the question before us—the question of whether advertising signs can be eliminated without payment of compensation except as amortization may represent just compensation. The case simply points up that Lamm wanted to adopt the approach used here by the City rather than the method used by the federal government in the Highway Beautification Act and the method subsequently adopted by the State of Colorado. Although at time of trial the City made a half-hearted attempt to show that the ordinance was passed in the interest of public safety, the unsupported conclusions of its witness were totally destroyed by the testimony of plaintiffs' expert, and there was no believable testimony that the ordinance is in any way related to public safety. In fact, the City fell back on an environmental approach and it relied on its expert, Stuart L. Udall, former Secretary of the Interior, and a lawyer who is "presently involved in environmental planning," Mr. Udall testified:

". . . The visual environment obviously is a very important component, and the environment of course as we understand it now is the science of interrelating all this bundle of things that we used to consider separately, and obviously the visual part of the environment, the appearance of a city, for example, whether we're talking about the natural beauty of a city or the inter-relationship between the natural beauty and those activities of man which alter that environment. This is obviously a very important component of the environment. . .

". . . The visual aspect of a community of a region is obviously a very important element of the environmental planning that indeed encompasses

the total environment. It has to involve itself in policy with regard to signs, with regard to graphics, with regard to the mix between the natural world and the man activities that are involved. So, of course, when you narrow this to the subject of signs as an element of the environment, the question of uses becomes a critical question."

Although Mr. Udall suggested that city beautification is a public concern of quite recent origin, it was recognized by the Supreme Court almost twenty years ago in Berman v. Parker (1954) 348 U. S. 26, 75 S.Ct. 98, 99 L.Ed. 27. Justice Douglas there said:

"If those who govern the District of Columbia decide that the Nation's Capital should be beautiful as well as sanitary, there is nothing in the Fifth Amendment that stands in the way."

But Justice Douglas added:

*"The rights of these property owners are satisfied when they receive that just compensation which the Fifth Amendment exacts as the price of the taking."*

Justice Douglas and Mr. Udall see eye to eye on the subject, because Mr. Udall's testimony continued:

[He testified that he was familiar with the Highway Beautification Act and that he participated in its formulation.]

"I think in the beginning, within the administration, once it was decided that this should be added as a major amendment to the entire State Highway Act of 1956, the question of how this could be accomplished was widely discussed and there really were two alternatives. Indeed, they are the two alternatives that you have if a govern-

ment desires to eliminate undesirable signs, and one is immediate condemnation and payment—full payment for the value of what is taken. The other is some kind of a scheme of amortization, and these two were discussed and considered initially, and the plan that Congress finally adopted was a taking, and outright payment.

"THE COURT: Let me interrupt a minute, Mr. Udall, and see if I follow you. Do you feel as an expert in the field that signs can be taken under either of two alternative methods; first a method of immediate condemnation with the payment of just compensation? Or, in the alternative, a delayed taking which permits an amortization of the investment? [2]

"THE WITNESS: I think these clearly are the two alternatives, yes.

"THE COURT: So, that if a community, if a governments elects to follow the second alternative, the validity of that election is dependent upon the sufficiency of the amortization provided, isn't that true?

"THE WITNESS: Where [whether] it's reasonable, yes." [3]

In Rabinoff v. District Court (1961) 145 Colo. 225, 360 P.2d 114, Judge Doyle [with Judge McWilliams concurring] quoted with approval some of the same language we have quoted from Berman v. Parker, and in *Rabinoff* mention is made of the fact that the Colorado Constitution differs in its language from the Fifth Amendment and this is one of the reasons we did not abstain on the Fifth Amendment claim.

■ Accordingly, we have no difficulty in concluding that if the citizens of the City and County of Denver wish to eliminate some or all signs, they may do so if they are willing to follow the

---

2. As will be discussed later, the impromptu use of the word "investment" was inartful. The phrase "fair market value" should have been used instead of "investment."

3. Admittedly, Mr. Udall was testifying as an expert on the law at this point, but it came out during his direct examination as an expert for the city, and we regard his statement of position as being in effect a statement of position made by "special counsel"—especially when his contract of employment by the city is studied.

procedures required of the federal government under the Highway Beautification Act, the procedures adopted by the State of Colorado, and procedures said by their own special counsel-expert witness to be necessary. In other words, a legislative determination that the elimination of signs is in furtherance of an aesthetic public purpose is entirely proper, and the only question which remains is whether the Denver ordinance provides for the payment of whatever just compensation the Fifth Amendment demands. As a corollary to this question is the determination of whether the ordinance is a regulation enacted under the city's police power, thereby eliminating necessity for the payment of any compensation.

Volumes have been written on the subject, and the courts have been unable to formulate or agree upon any precise rule to distinguish between a permissible regulation and an impermissible taking. We follow the mandate of United States v. Central Eureka Mining Co., *supra*, to ascertain the particular facts of our case.

We reiterate that the Denver ordinance by its terms pretty much contradicts the City's argument that no compensation is required, because the ordinance does not attempt to impose an immediate prohibition on any signs. It sets up an amortization schedule keyed to cost of replacement, and, under the decided cases, this is a recognition that some compensation is owed. Under Denver's ordinance, a sign which would cost $3,000 to replace must be torn down in two years, while a sign which would cost $15,001 to replace can remain standing five years. The ordinance ignores the actual investment of the owner, it ignores the market value of the sign, and it ignores the extent to which a particular owner has recaptured either his investment or the sign's market value, just as it disregards the length of the unexpired leasehold term. It fails in these respects in the face of the following facts which were proven at trial:

1. There is no correlation between signs and public safety or accidents, nor was there any proof that signs cause accidents. The proof was to the contrary.

2. Most signs are leased for five year terms, and approximately three-fourths of the leases are renewed for an additional term or terms. Although the lessor sign companies attempt to make a small profit during the initial leasehold term, the real profit is derived from the renewals, and, additionally, the lessee gets a better deal during the renewal term. Thus, both parties have a business incentive to renew.

3. There is a market for the sale of sign leases, and sales prices of sign leases include an increment of the probability of renewal of the lease.

4. All signs, over varying periods of time, become obsolete, and when they do, they are removed.

5. Almost without exception, the signs are not adaptable for use elsewhere, and, typically, the salvage value of a sign which must be removed does not equal removal cost.

6. Physical depreciation of signs is minimal. This is evidenced by the fact that the Assessor of the City and County of Denver does not permit depreciation of signs for property tax purposes. [The City offered no evidence that the Assessor will change his position even as to signs which must be destroyed under the ordinance.]

7. Every sign in Denver was erected under a permit charged for and issued by the City.

8. In the opinion of most people, many signs and their proliferation are garish eyesores, but due to oddities in the ordinance, some of the most aesthetically offensive signs remain perfectly legal under the ordinance.

9. Flashing, blinking, fluctuating or animated signs are typically the most expensive, but, except for aesthetic considerations, the evidence failed to establish any reason they should be removed sooner than other signs. Additionally, the evidence established the fact that be-

474

cause of the design of such signs, their utility is greatly diminished or destroyed if the movable characteristics of such signs are eliminated. If the blinking, flashing or animation is shut off, the function of the signs would be severely impaired, and the leases between the parties would be effectively terminated, because the lessee would not be receiving that which he bargained for.

10. Plaintiffs lawfully invested substantial sums of money in the manufacture and erection of signs or in the leasing of signs erected on their premises.

11. In many instances, the market value of the lessees' businesses will be diminished if the signs are removed.

12. As to most of the signs, the ordinance prohibits any use rather than merely restricting the type or extent of use of the signs.

13. Because they are custom made, there is no other location within or without the City and County of Denver at which the signs can be used.

14. There is no relationship between replacement cost and unexpired leasehold term, and there is but limited relationship between replacement cost and either market value or useable life. There is a relationship between investment and replacement cost, but they are a far cry from being identical.

■ Defendants initially urge that because of the presumptive constitutionality of any legislative act we must search for some rationale which will support constitutionality and they stress that we cannot substitute our judgment for that of City Council. They cite cases such as Baum v. Denver, 147 Colo. 104, 363 P.2d 688; Bird v. City of Colorado Springs, Colo., 489 P.2d 324; Standard Oil Company v. City of Marysville, 279 U.S. 582, 49 S.Ct. 430, 73 L. Ed. 856, and Goldblatt v. Town of Hempstead, 369 U.S. 590, 82 S.Ct. 987, 8 L.Ed.2d 130. These cases support and we agree with these broadly stated legal principles. Here, defendants elected to try to support the constitutionality of the ordinance on their environmental

theory, and their own expert testified that just compensation in one form or another is required. Moreover, we say again that the ordinance itself demonstrates Council's determination that compensation by way of amortization is necessary. As stated in defendants' brief, the case "involves no more and no less than a determination, within the scope of permissible judicial review, of whether the amortization periods provided by the ordinance are reasonable." No presumption of constitutionality and no deference to legislative wisdom will bail out the ordinance if it in fact effects a taking without the payment of just compensation.

Starting from defendants' simplified statement of the case; i. e., the statement that the case involves the single question of whether the amortization periods are reasonable, we refer at once to an annotation in 22 A.L.R.3rd 1134, entitled "Validity of Provisions for Amortization of Nonconforming Uses." A review of the cases there discussed demonstrates that with only a few exceptions, reasonable amortization periods have been held to eliminate need for the payment of just compensation. This seems to be the rule in Colorado. Service Oil Co. v. Rhodus (1972) Colo., 500 P.2d 807. Probably no case has been more frequently cited in support of the constitutionality of required amortization of non-conforming uses than Naegele Outdoor Advertising Co. v. Village of Minnetonka (1968), 281 Minn. 492, 162 N.W.2d 206. There, the village required the removal of all non-conforming billboards within three years. *Naegele* limited its attack to a contention that the ordinance was unconstitutional on its face, and the question of whether it was unconstitutional in its application, which is included in our case, was not there presented. The ordinance was upheld, and the Minnesota Court said:

"Plaintiff cannot successfully challenge this ordinance as unconstitutional on its face unless it would be unconstitutional as applied to the property interests of every billboard

owner. The underlying issue in making this determination must therefore be whether the amortization period provided by the statute is reasonable. If the value of plaintiff's property interest was extinguished before the running of the 3-year period, there would be no taking, or if the value of freedom from new competition for the statutory period equalled the value of the property interest remaining at the end of the period, there would be just compensation for the taking. In either case, the length of the amortization period is reasonable and the ordinance therefore is constitutional. Moreover, since several conceivable applications of the ordinance are reasonable, it is not unconstitutional by its terms. The question then becomes one of the unconstitutional application of the ordinance in a given case, and the burden is on plaintiff to establish that the ordinance, as applied, is unconstitutional. Plaintiff, however, has based its challenge on the argument that the ordinance is unconstitutional on its face and has introduced little or no evidence that the 3-year amortization period is unreasonable as applied.

.    .    .    .    .    .

"Finally, plaintiff claims that it was deprived of its property interest in the leases themselves. If a property right is taken for a public use, compensation by payment of its fair market value is required. In the case of a taking of a leasehold interest, this amount 'is the fair rental value of the premises less the amount of the rent for the remainder of the term.' In re Assessment for Widening Third Street in St. Paul, 176 Minn. 389, 390, 223 N.W. 458.

"Ten of the leases in question are oral and amount to no more than month-to-month tenancies. The value of such a leasehold is limited to the rental value of the premises for 30 days less the rent payment for that period. Riebs v. Milwaukee County Park Comm., 252 Wis. 144, 31 N.W.2d 190.

The other 8 leases are written and vary in length from 1 to 10 years. However, plaintiff has offered no evidence on the fair market value of any of these leases at the end of the statutory amortization period. Thus, it is impossible for us to say that there has been such a taking of a valuable property interest from plaintiff as to render this application of the ordinance unconstitutional."

Here, of course, plaintiffs have presented evidence on the subjects not decided by *Naegele,* and, as we shall discuss later, the Minnesota Court's definition of market value of a leasehold does not square with present Fifth Amendment law. Moreover, in *Naegele,* all billboards were treated alike, while here amortization periods vary with cost of replacement. The uncontradicted expert testimony in this case was to the effect, and we find, that there is no conceivable economic or accounting theory which lengthens or shortens the amortization period on the basis of replacement cost of a sign. The Internal Revenue Service would give short shrift to any such contention, and so do we. Carried to its inevitable illogical conclusion, the City's argument would have us say that in an urban renewal project, owners of small homes would have to get out without payment for their houses at the end of two years, but owners of more expensive homes couldn't be thrown out for five years. Highways could be built through residential areas, and the smaller homeowners could be thrown out in two years, but owners of luxury homes could stay put for five years, albeit none of the owners would ever be paid a dime for their homes.

Amortization is but a function of depreciation, and a smaller house of equivalent construction doesn't depreciate more rapidly than does a larger one, and neither does a smaller sign built from the same materials as a larger one depreciate in $\frac{2}{5}$ths of the time it takes a more expensive one to wear out. These comments we make not in support of any equal protection determination, but,

rather we make them as illustrative of the manifest unreasonableness of the amortization schedules in the Denver ordinance, even if amortization be held to be a type of payment of just compensation.

With this caveat to the ordinance's varying allowable amortization periods tied to replacement costs, we mention that without extended discussion by the Court, a five year amortization period for all nonconforming signs was upheld in E. B. Elliott Advertising Co. v. Metropolitan Dade County (1970) 5 Cir., 425 F.2d 1141. The Court held that elimination of signs was in furtherance of a permissible legislative determination of public purpose [a determination we have already made in this case], and in addressing itself to the Fifth Amendment question, the court said:

> "The final issue presented by this appeal is whether Ordinance No. 63–26 deprives the appellants and others of their class of their property without just compensation contrary to the due process requirements of the Fourteenth Amendment. See Panhandle E. Pipe Line Co. v. State Highway Comm., 294 U.S. 613, 55 S.Ct. 563, 79 L.Ed. 1090 (1935).
>
> "Ordinance No. 63–26 was enacted on July 2, 1963, and provides that nonconforming signs may continue to be maintained until March 1, 1968, thus providing an amortization period of five years. In Standard Oil Co. v. City of Tallahassee, N.D.Fla.1949, 87 F.Supp. 145, aff'd. 5 Cir. 1950, 183 F.2d 410, cert. den. 340 U.S. 892, 71 S.Ct. 208, 95 L.Ed. 647, it was held a zoning ordinance requiring the discontinuance of a nonconforming use after the expiration of a five-year amortization period did not constitute a deprivation of property without due process of law. Accord, Naegele Outdoor Adv. Co. v. Village of Minnetonka, Minn.1968 [281 Minn. 492], 162 N.W.2d 206; City of Seattle v. Martin, 1959, 54 Wash.2d 541, 342 P.2d 602;

Grant v. Mayor and City Council of Baltimore, 212 Md. 301, 129 A.2d 363 (1957); City of Los Angeles v. Gage, 1954, 127 Cal.App.2d 442, 274 P.2d 34. Therefore, the requirement contained in the ordinance that all nonconforming signs be removed by March 1, 1968, does not constitute a taking of property for which compensation must be given under the Fourteenth Amendment."

At time of trial, we thought that E. B. Elliott Advertising Co., *supra,* was persuasive authority for upholding an ordinance which would require removal of all non-conforming signs at the end of a five year period, but E. B. Elliott Advertising Co., *supra,* was decided and our trial was held before January 16, 1973, the date on which Almota Farmers Elevator & Warehouse Co. v. United States, 409 U.S. 470, 93 S.Ct. 791, 35 L.Ed.2d 1 was decided.[4] Our trial date thinking stemmed from the evidence that almost all sign leases were for a five year period and from a belief that the leasehold term fixed the measure of compensation. Colloquy in the record shows that we so understood United States v. Petty Motor Co. (1945) 327 U.S. 372, 66 S.Ct. 596, 90 L.Ed. 729. We understood Petty Motor Co. as did the four dissenting Justices in Almota Farmers Elevator and Warehouse Company, where, speaking for the dissent, Justice Rehnquist said:

> "In United States v. Petty Motor Co., supra, the Government acquired by condemnation the use of a structure occupied by tenants in possession under leases for various unexpired terms. The Court held that the measure of damages for condemnation of a leasehold is the value of the tenant's use of the leasehold for the remainder of the agreed term, less the agreed rent. The Court considered the argument, essentially the same raised by petitioner here, that a history of past renewal of the leases to existing tenants creates a compensable expectancy,

4. Both also antedated Shutler v. United States (1973) 10 Cir., 470 F.2d 1143.

but held that the right to compensation should be measured solely on the basis of the remainder of the tenant's term under the lease itself. 327 U.S., at 380 [66 S.Ct. 596]. In so deciding, the Court stated:

'The fact that some tenants had occupied their leaseholds by mutual consent for long periods of years does not add to their rights. Emery v. Boston Terminal Co., 178 Mass. 172, 185, 59 N.E. 763 [per Holmes, C. J.]:

' "It appeared that the owners had been in the habit of renewing the petitioners' lease from time to time. . . . Changeable intentions are not an interest in land, and although no doubt such intentions may have added practically to the value of the petitioners' holding, they could not be taken into account in determining what the respondent should pay. They added nothing to the tenants' legal rights, and legal rights are all that must be paid for. Even if such intentions added to the saleable value of the lease, the addition would represent a speculation on a chance, not a legal right." ' 327 U.S., at 390 n. 9. [66 S.Ct. 596].

"The holding in Petty was consistent with a long line of cases to the effect that the Fifth Amendment does not require, in a taking of a property interest, compensation for mere expectancies of profit, or for the frustration of licenses or contractual rights which pertain to the land, but which are not specifically taken and which are not vested property interests. Omnia Commercial Co. v. United States, 261 U.S. 502, 510 [43 S.Ct. 437, 67 L.Ed. 773] (1923); Sinclair Pipe Line Co. v. United States, 287 F.2d 175, 178 [152 Ct.Cl. 723] (1961); Chicago, M., St. P. & P. R. Co. v. Chicago, R. I. & P. R. Co., 138 F.2d 268, 270–271 (CA8 1943), cert. denied, 320 U.S. 804 [64 S.Ct. 437, 88 L.Ed. 486] (1944)."

Because of our misunderstanding of *Petty Motor Co.*, it was with reluctance that we permitted testimony concerning the probability of renewal; that such probability is traded in the marketplace and is subject to market value determination. It is fortunate that we did permit the testimony, because the majority in *Almota Farmers Elevator and Warehouse Company* held:

"In view of this conflict in the circuits, we granted certiorari, 405 U.S. 1039 [92 S.Ct. 1312, 31 L.Ed.2d 579], to decide an important question of eminent domain law: 'Whether, upon condemnation of a leasehold, a lessee with no right of renewal is entitled to receive as compensation the market value of its improvements without regard to the remaining term of its lease, because of the expectancy that the lease would have been renewed.'

.    .    .    .    .    .

"The Fifth Amendment provides that private property shall not be taken for public use without 'just compensation.' 'And "just compensation" means the full monetary equivalent of the property taken. The owner is to be put in the same position monetarily as he would have occupied if his property had not been taken.' United States v. Reynolds, 397 U.S. 14, 16 [90 S.Ct. 803, 805, 25 L.Ed.2d 12] (footnotes omitted). See also United States v. Miller, 317 U.S. 369, 373 [63 S.Ct. 276, 279, 87 L.Ed. 336]. To determine such monetary equivalence, the Court early established the concept of 'market value': the owner is entitled to the fair market value of his property at the time of the taking. New York v. Sage, 239 U.S. 57, 61 [36 S. Ct. 25, 26, 60 L.Ed. 143]. See also United States v. Reynolds, supra, [397 U.S.] at 16 [90 S.Ct. at 805]; United States v. Miller, supra, [317 U.S.] at 374 [63 S.Ct. at 280]. And this value is normally to be ascertained from 'what a willing buyer would pay in cash to a willing seller.' United States v. Miller, supra, at 374 [63 S. Ct., at 280]. See United States v. Virginia Electric and Power Co., 365 U.S. 624, 633 [81 S.Ct. 784, 790, 5 L. Ed.2d 838].

"By failing to value the improvements in place over their useful life—*taking into account the possibility that the lease would be renewed* as well as the possibility that it might not—the Court of Appeals in this case failed to recognize what a willing buyer would have paid for the improvements. If there had been no condemnation, Almota would have continued to use the improvements during the renewed lease term, or if it sold the improvements to the fee owner or to a new lessee at the end of the lease term, it would have been compensated for the buyer's ability to use the improvements in place over their useful life.

· · · · · · ·

"United States v. Petty Motor Co., 327 U.S. 372, [66 S.Ct. 596, 90 L.Ed. 729], upon which the Government primarily relies, does not lead to a contrary result. The Court did indicate that the measure of damages for the condemnation of a leasehold is to be measured in terms of the value of its use and occupancy for the remainder of the lease term, and the Court refused to elevate an expectation of renewal into a compensable legal interest. But the Court was not dealing there with the fair market value of improvements. Unlike Petty Motor, there is no question here of creating a legally cognizable value where none existed, or of compensating a mere incorporeal expectation. The petitioner here has constructed the improvements and seeks only their fair market value. Petty Motor should not be read to allow the Government to escape paying what a willing buyer would pay for the same property.

· · · · · · ·

"At the time of the taking in this case, there was an expectancy that the improvements would be used beyond the lease term. But the Government has sought to pay compensation on the theory that at that time there was no possibility that the lease would be renewed and the improvements used beyond the lease term. It has asked that the improvements be valued as though there were no possibility of continued use. That is not how the market would have valued such improvements; it is not what a private buyer would have paid Almota.

" 'The constitutional requirement of just compensation derives as much content from the basic equitable principles of fairness, United States v. Commodities Trading Corp., 339 U.S. 121, 124 [70 S.Ct. 547, 94 L.Ed. 707] (1950), as it does from technical concepts of property law.' "

■■■■ *Almota* emphatically holds that market value [5] over the useful life of the improvements is the test. *Almota* rejects the unexpired leasehold term as the measure of value, and it demands that the provable value of a probability of renewal must be paid for. Read in the way most favorable to upholding its constitutionality, the Denver ordinance by its terms uses "replacement cost" as the measure of value, and, based on the record made, it may vaguely relate the amortization period to unexpired leasehold term, but it certainly does not permit amortization over useful life. If *Almota* means what we think it says, even the longest amortization permitted under the Denver ordinance does not approach compensating the owners for the value of the signs over their useful life, even if amortization is said to be permissible compensation. Therefore, whatever may have been the law before 1973, after *Almota,* it must be held that the amortization provided by the Denver ordinance does not meet the Fifth Amendment's requirement for the payment of just compensation.[6] Legislative rough approximations of just compensation won't do.

5. "Market value" is the established test in the law, and the court's reference at time of trial to an owner's "investment" was inadvertent.

6. Just what overall effect *Almota* has on the constitutionality of amortization of non-conforming uses we leave for another day and, we hope, another court.

*Almota* effectively disposes of this case,[7] but additional comments are in order. The hairline distinction between permissible regulation and compensable taking is fully discussed in the majority and dissenting opinions in City of St. Paul v. Chicago, St. Paul, Minneapolis and Omaha Railway Company (1969) 8 Cir., 413 F.2d 762. The majority held that a height restriction on future buildings which could be erected on the railroad's lands was permissible. The majority said, inter alia:

"Neither constitutional provision interposes a barrier to the imposition of restrictions on the use of private property if a zoning ordinance is enacted pursuant to a valid exercise of the police power. Goldblatt v. Town of Hempstead, 369 U.S. 590, [593, 82 S.Ct. 987, 8 L.Ed.2d 130]. . . .

"The test is whether the enactment falls within that power is one of reasonableness.

"The zoning ordinance will be sustained unless its ' * * * provisions are clearly arbitrary and unreasonable, having no substantial relation to the public health, safety, morals, or general welfare.

. . . . . .

"The mere fact that the ordinance seriously *depreciates* the value of the complainants' property is not enough to establish its invalidity. Goldblatt v. Town of Hempstead, supra at 594, 82 S.Ct. at 990, American Wood Products Co. v. City of Minneapolis, 21 F. 2d 440, 444 (D.Minn.1927) (J. Sanborn), aff'd, 35 F.2d 657 (8th Cir. 1929); Kiges v. City of St. Paul [240 Minn. 522], 62 N.W.2d [363] at 369. Nor can it be invalidated on the grounds that aesthetic considerations will be furthered if it is permitted to stand. Berman v. Parker, 348 U.S. 6, [75 S.Ct. 98, 99 L.Ed. 27] . . . ..

"No evidence was offered at trial to show: that the ordinance was designed to restrict competition, compare, Pearce v. Village of Edina, 263 Minn. 553, 118 N.W.2d 659, 671, n. 1 (1962); or that the railroads acquired the property with the expectation that it would be used in the manner they now seek, compare, Alexander v. City of Minneapolis, 267 Minn. 155, 125 N. W.2d 583, 585 (1963); or that the railroads cannot continue to use their property as they have in the past."

Judge Mehaffy filed a vigorous dissent. He said:

"The majority opinion is erroneously based first on the mistaken assumption that there is no 'taking' of appellees' property, and hence no violation of the mandate of the Fifth Amendment that ' * * * nor shall private property be taken for public use, without just compensation,' and Article 1, § 13 of the Minnesota Constitution which provides that 'private property shall not be taken, destroyed or damaged for public use without just compensation therefor, first paid or secured.' The Supreme Court has long and consistently held that governmental restrictions can so diminish the value of property as to constitute a taking. In United States v. Central Eureka Mining Co., 357 U.S. 155, 168, 78 S.Ct. 1097, 1104, 2 L.Ed.2d 1228 (1958), the Court said:

"Traditionally, we have treated the issue as to whether a particular governmental restriction amounted to a constitutional taking as being a question properly turning upon the particular circumstances of each case. * * * *In doing so, we have recognized that action in the form of regulation can so diminish the value of property as to constitute a taking.*' " [Emphasis by the Court]

---

7. Amicus Consumers for Better Signs and Plan Metro Denver distinguishes *Almota* on the ground that it was an eminent domain case, and, says Amicus, *Almota* is therefore inapplicable. We do not subscribe to the theory that the applicability of the Fifth Amendment is governed by the nomenclature or form of the action.

The dissenting opinion then distinguishes the cases on which the majority relied [and in large part they are the cases urged by the City here] and Judge Mehaffy expressed the strong view that the St. Paul ordinance effected a taking. On rehearing, to consider the effect, if any, of Jankovich v. Indiana Toll Road Commission, 379 U.S. 487, 85 S.Ct. 493, 13 L.Ed.2d 439, the judges adhered to their earlier views. We do not think that even the views of the majority in *City of St. Paul* are particularly supportive of the City's contentions here. A reading of the opinions in that case convinces that the ordinance was upheld because reasonable uses of the property by the railroad company remained, and the St. Paul ordinance restricted only the *type of use* instead of prohibiting *all use* as does the Denver sign ordinance. In *Jankovich*, the Supreme Court held that the writ of certiorari had been improvidently granted for the reason that the decision of the Indiana Supreme Court was based upon state rather than federal constitutional grounds. The Indiana Court held that an ordinance of the City of Gary limiting the height of improvements in airway approach lanes to 18 feet was a taking which required the payment of compensation, and in dismissing the writ of certiorari, Justice White said:

> "The Indiana Supreme Court had before it a case in which the effect of the ordinance was to establish a maximum height of 18 feet for structures on respondent's land. Although it recognized that zoning regulations may be upheld as a reasonable exercise of the police power *'where the owner of property is merely restricted in the use and enjoyment of his property,'* [Indiana Toll Road Commission v. Jankovich] 244 Ind. at 581, 193 N. E.2d at 240–241, the court held that a taking requiring compensation rather than mere regulation—was effected here because 'the City of Gary has at-

tempted, by the passage of the ordinance under consideration, to take and appropriate to its own use the ordinary usable air space of property adjacent to the Gary Airport.' "

Justice White said that no opinion was expressed as to the constitutionality of the ordinance under the Fifth Amendment, and we do not quote the case as an expression of any such view. However, his opinion does make the distinction we deem applicable—the distinction between a restriction on type of use and a prohibition against any reasonable use [and in our case a prohibition against any use at all.] Where the ordinance does no more than to reasonably restrict uses, leaving available other uses, it properly can be said to be within the police power and payment of compensation is not required. Where the ordinance prohibits any use or where it prohibits all reasonable uses, there is a taking, and the Fifth Amendment comes into play and demands the payment of just compensation. The Denver ordinance is in the second category, and, unless payment of just compensation is provided for, the ordinance must fall.

An illustration of the distinction between restrictions on the use of property and orders for the destruction of property can be drawn from the current public debate over the environmental problem of air pollution caused by automobiles. There is much grumbling over threatened gasoline rationing which would curtail the use of automobiles, but, assuming, arguendo, that such a regulation would be a valid exercise of the police power permitting reasonable restrictions on the use of automobiles, the same cleanliness of the air could be more expeditiously obtained by ordering the destruction of fifty percent of the automobiles in the country.[8] The general public would immediately cry out that such a command was unconstitutional under the Fifth Amendment as an uncompensated taking. The Denver ordi-

---

8. Under the theory of Denver's ordinance, Vegas would have to be destroyed in two years, Impalas in three years, Olds- mobiles in four years and Cadillacs in five years.

nance is no less unconstitutional just because it is aimed at sign companies instead of drawing bead on the public at large.

The headon collision between claims of police power and constitutional protections is as old as is our country. Just so long as their own property is not the object of attack, zealots are eager to bring about their ends through police power claims, but the limitations on the accomplishment of such righteous desires has never been better expressed than in the words of Justice Holmes in Pennsylvania Coal Co. v. Mahon (1922) 260 U.S. 393, 43 S.Ct. 158, 67 L.Ed. 322:

". . . The protection of private property in the Fifth Amendment . . . provides that it shall not be taken for [public] use without compensation. . . . When this seemingly absolute protection is found to be qualified by the police power, the natural tendency of human nature is to extend the qualification more and more until at last private property disappears. But that cannot be accomplished in this way under the Constitution of the United States . . . .

*"We are in danger of forgetting that a strong public desire to improve the public condition is not enough to warrant achieving the desire by a shorter cut than the constitutional way of paying for the change."* [emphasis supplied.]

Perhaps [and we do not pass on the question] if City Council wishes, or if a majority of the people of the City wish, all or any part of the signs in Denver can be eliminated. But, if so, they can be eliminated only in accordance with the requirements of the Fifth Amendment, and the prohibitions against shortcuts mentioned by Justice Holmes are still enjoined by the Constitution. At best, if City Council wishes, or if a majority of the people of the City wish, all or any part of the signs in Denver can be eliminated by an ordinance which provides for the payment of "the full monetary equivalent of the property tak-

en (which includes) what a willing buyer would have paid . . . for the buyer's ability to use the improvements over their useful life." Almota Farmers Elevator & Warehouse Co. v. United States (1973) 409 U.S. 470, 473, 474, 93 S.Ct. 791, 794, 795, 35 L.Ed.2d 1. Denver's signs can be eliminated if Denver is willing to provide for such elimination in the way the federal government and the state has so provided. Whether Denver wants to incur this expense is a decision City Council and the taxpayers must make.

We do not hold that immediate full payment in cash is necessarily the only possible solution. We hold only that the present Denver ordinance does not provide for the payment of just compensation. Whether a constitutional ordinance which does not require a cash payment of just compensation can be devised, we leave to the ingenuity of the City. Our decision today is limited to the existing ordinance which is all that is before us. Sec. 613.5–5(4) and Sec. 613.5–5(4)(a) are violative of the protections of the Fifth Amendment of the Constitution of the United States, and they are unconstitutional.

With this determination, we do not reach the other constitutional questions presented, because we should not resolve "constitutional questions unless their answers are indispensable to the disposition of the cause before us." Stefanelli v. Minard, 342 U.S. 117, 72 S.Ct. 118, 96 L.Ed. 138. See, also, Peters v. Hobby, 349 U.S. 331, 75 S.Ct. 790, 99 L.Ed. 1129; United States v. Spector, 343 U.S. 169, 72 S.Ct. 591, 96 L.Ed. 863, and Toomer v. Witsell, 334 U.S. 385, 68 S.Ct. 1156, 92 L.Ed. 1460.

Plaintiffs seek injunctive relief against the enforcement of Sec. 613.5–5(4)(a) of Denver's Revised Municipal Code. A preliminary injunction against the enforcement of that section was granted on December 9, 1971, and that preliminary injunction is made permanent. As to the remaining portions of Sec. 613.5–5(4), of the Revised Municipal Code of the City and County of Denver, plaintiffs ask only declaratory re-

lief, and this memorandum opinion sets forth the findings and conclusions supportive of the declaratory judgment requested. Plaintiffs are directed to submit an appropriate form of declaratory judgment within 10 days of the date of this opinion, which judgment shall include a declaration that Denver's Revised Municipal Code, Sec. 613.5–5(4) and Sec. 613.5–5(4)(a) are violative of the Fifth Amendment of the Constitution of the United States because they attempt to accomplish a taking of property without the payment of just compensation. Plaintiffs and Intervenor shall be awarded their costs. Amicus shall bear their own costs.